[Crim. No. 579.   Fourth Dist.   Jan. 10, 1947.]

THE PEOPLE, Respondent, v. JOSEPHINE CHAVEZ;. Appellant.

Stutsman, Hackett & Nagel for Appellant.

Robert W. Kenny, Attorney General and John F. Hassler, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of her newborn baby. A jury found her guilty of manslaughter and she has appealed from the judgment.

The defendant was an unmarried woman about 21 years of age. She had previously had an illegitimate child, and at about 12:30 a. m. on March 31, 1945, she gave birth to the child here in question. She lived with her mother and sisters in a small house having two bedrooms, with a bathroom off the kitchen porch. On this night the mother slept in the back bedroom, and the defendant occupied the front bedroom with her two sisters. She had attempted to conceal the fact of her pregnancy from her family by wearing a girdle and loose sweaters.

The circumstances surrounding the birth of this baby are disclosed by the testimony of the defendant alone, as there were no other eyewitnesses. After going to bed on the evening of March 30, she had several attacks of what she called "cramps." Apparently, she mistook her labor pains for cramps. Twice she arose and went through the kitchen and back porch to the bathroom, and then returned to her bed. She made a third trip about 12:30 a. m., the other members of her family being asleep. She left the doors open and no lights were turned on. As she was sitting on the toilet she "felt a little pressure on the lower bones. Then I knew the baby was going to be born." She had not expected it to be born until the latter part of April. She did not call for help and, so far as she knew, no one was awake. She testified that "It came out rather slow. Next, the head was out, and it sort of dropped out real fast." She knew from her previous experience that the placenta had to be removed and so, after the baby was in the toilet "a little while," she expelled the placenta by putting pressure on her stomach. She did not notice whether the baby's head was under water, because the afterbirth fell over its head. It took two to three minutes for the placenta to come out. She then turned on the light

and found a napkin and pinned it on herself. She then removed the baby from the toilet, picking it up by the feet, and cut the cord with a razor blade. She testified that the baby was limp and made no cry; that she thought it was dead; and that she made no attempt to tie the cord as she thought there was no use. She then laid the baby on the floor and proceeded to take further care of herself and clean up the room. The baby remained on the floor about fifteen minutes, after which she wrapped it in a newspaper and placed it under the bath tub to conceal it from her mother. She then returned to bed and the next day went about as usual, going to a carnival that evening. On the next day, April 1, her mother discovered the body of the infant under the bath tub.

An autopsy was performed by a physician. He testified that the cord on the baby was about eighteen inches long, untied and depleted of blood; that the baby would live until it bled to death, in this case about an hour; that the baby appeared to be a full nine-month child and weighed about 6½ pounds; that it appeared normal in every respect; that the lips were dark and swollen, but blood had been extravasated out of the vessels into the tissues of the lips and cheeks; that the tongue was dark and appeared hemorrhaged; that he opened the chest and stomach; that the lungs appeared normal and had air in them, the texture of which could be followed; that there was "crepitation"; that the heart and liver and other internal organs appeared normal; and that the body had very little blood in it, indicating hemorrhage. He expressed the opinion that the child was born alive, based on conditions he found and the fact that the lungs contained air and the blood was extravasated or pushed back into the tissues, indicating heart action. Although he admitted, on cross-examination, that certain things were possible, he gave his reasons for excluding them here and reaffirmed his opinion that this baby was born alive and that it had had independent lung and heart action.

■ The appellant first contends that there is no substantial evidence to support the verdict in that it does not sufficiently appear from the evidence that this infant was born alive and became a human being; that it appears from the testimony of another doctor, called by the defense, that the doctor performing the autopsy did not use certain tests which might have been used and did not open the infant's head and

heart which this other doctor thought might disclose some possibilities; and that it follows that the question of whether this infant was born alive and became a human being rests entirely on pure speculation.

While the autopsy surgeon expressed the firm opinion that this child was born alive, giving his reasons therefor, he admitted that it was possible that the main factors on which he based his opinion, the inflation of the lungs and the evidence of heart action, could have resulted from the child's breathing after presentation of the head but before the birth was completed. In other words, before there was a complete separation of the child from the mother. The respondent has presented a very able review and analysis of the leading cases along this line from the older and the modern common law of England (*Rex* v. *Poulton,* 24 E.C.L.R. 590; *Rex* v. *Enoch and Pulley,* 5 Carr. & Pay. 539; 24 E.C.L.R. 696; *Rex* v. *Eliza Brain,* 6 Carr. & Pay. 349; 25 E.C.L.R. 468; *Rex* v. *Elizabeth Sellis,* 7 Carr. & Pay. 850; 32 E.C.L.R. 905; *Rex* v. *Ann Crutchley,* 7 Carr. & Pay. 813; 32 E.C.L.R. 887; *Regina* v. *Reeves,* 38 E.C.L.R. 27; *Regina* v. *Ann Wright,* 9 Carr. & Pay. 754; 38 E.C.L.R. 437; *Regina* v. *Milborough Trilloe,* 1 Carr. & Mar. 650; 41 E.C.L.R. 352; *Rex* v. *Pritchard,* 17 T.L.R. 310) and from other states in this country which still closely follow the common law rules in this regard. (*State* v. *Winthrop,* 43 Iowa 519 [22 Am.Rep. 257]; *Morgan* v. *State,* 148 Tenn. 417 [256 S.W. 433]; *Shedd* v. *State,* 178 Ga. 653 [173 S.E. 847]; *Jackson* v. *Comm.,* 265 Ky. 295 [96 S.W. 2d 1014].) While it would be interesting, in the interest of brevity it seems unnecessary to review these cases here. Some of these cases involve situations where an injury inflicted upon the mother resulted in the death of an unborn child. Others seem to be based upon such theories as that unattended childbirth is so violent a proceeding that the life of the child is in natural jeopardy or that the mother, because of momentary insanity or because of physical disability, should not be held responsible for a premeditated killing in the act of birth or for a death resulting from neglect after birth. For these and similar reasons, very stringent rules were developed at common law and have been largely followed in common law states in this country. Most of these jurisdictions have bridged the gap thus resulting by adopting various forms of infanticide statutes making the destruction of unborn infants or of infants not completely born a crime, but providing for

a lesser punishment. While the matter was variously stated in these cases, and while some of them are somewhat inconsistent with others, it was generally held under the older common law that a child did not become a human being and could not be the subject of a homicide until it was completely born alive, was entirely separated from its mother and had an entirely independent life, with the cord cut and with its own breathing and heart action. Some of the cases have gone to ridiculous lengths, and others have varied some of the requirements, but these rules have largely been retained in the modern common law and in common law states in this country. While there have been some modifications of the rules these jurisdictions still require a rather complete separation from the mother and a rather complete demonstration that there was an entirely independent existence in the child before considering the infant as a human being, although in some of the more modern cases it has been held that the cutting of the cord was not necessary to this end.

Beyond question, it is a difficult thing to draw a line and lay down a fixed general rule as to the precise time at which an unborn infant, or one in the process of being born, becomes a human being in the technical sense. There is not much change in the child itself between a moment before and a moment after its expulsion from the body of its mother, and normally, while still dependent upon its mother, the child, for some time before it is born, has not only the possibility but a strong probability of an ability to live an independent life. It is well known that a baby may live and grow when removed from the body of its dead mother by a Caesarian operation. The mere removal of the baby in such a case or its birth in a normal case does not, of itself and alone, create a human being. While before birth or removal it is in a sense dependent upon its mother for life, there is another sense in which it has started an independent existence after it has reached a state of development where it is capable of living and where it will, in the normal course of nature and with ordinary care, continue to live and grow as a separate being. While it may not be possible to draw an exact line applicable to all cases, the rules of law should recognize and make some attempt to follow the natural and scientific facts to which they relate. As Judge Cardoza once said: "Let the facts be known as they are, and the law will sprout from the seed and turn its branches toward the light." There is no sound rea-

son why an infant should not be considered a human being when born or removed from the body of its mother, when it has reached that stage of development where it is capable of living an independent life as a separate being, and where in the natural course of events it will so live if given normal and reasonable care. It should equally be held that a viable child in the process of being born is a human being within the meaning of the homicide statutes, whether or not the process has been fully completed. It should at least be considered a human being where it is a living baby and where in the natural course of events a birth which is already started would naturally be successfully completed. While the question of whether death by criminal means has resulted while the process of birth was being carried out, or shortly thereafter, may present difficult questions of fact, those questions should be met and decided on the basis of whether or not a living baby with the natural possibility and probability of growth and development was being born, rather than on any hard and fast technical rule establishing a legal fiction that the infant being born was not a human being because some part of the process of birth had not been fully completed.

The question presented has not been decided in this state. Section 192 of the Penal Code provides: "Manslaughter is the unlawful killing of a human being, without malice. . . ." In *Scott* v. *McPheeters,* 33 Cal.App.2d 629 [92 P.2d 678, 93 P.2d 562], it was pointed out that the theory under another statute that an unborn child is a human being separate and distinct from its mother is something more than a fiction and is based upon scientific fact, common experience and knowledge. In fact, it would be a mere fiction to hold that a child is not a human being because the process of birth has not been fully completed, when it has reached that state of viability when the destruction of the life of its mother would not end its existence and when, if separated from the mother naturally or by artificial means, it will live and grow in the normal manner. In practical effect, the rules that have developed at common law furnish a presumption that the baby in question is, or will be, born dead. This presumption is not only contrary to common experience and the ordinary course of nature, but it is contrary to the usual rule with respect to presumptions followed in this state. Section 1963 (28) of the Code of Civil Procedure provides that, while it may be disputed, it is to be presumed "that things have happened according to the

ordinary course of nature and the ordinary habits of life.''
While this presumption may not be sufficient for every pur-
pose it is not only some evidence, but it suggests the proper
manner of approach in considering all of the evidence.

Without drawing a line of distinction applicable to all cases,
we have no hesitation in holding that the evidence is sufficient
here to support the implied finding of the jury that this child
was born alive and became a human being within the meaning
of the homicide statutes. That it became a human being does
not rest upon pure speculation. The evidence is sufficient to
support a finding, beyond a reasonable doubt, that a live child
was actually born here, and that it died because of the negli-
gence of the appellant in failing to use reasonable care in
protecting its life, having the duty to do so. This baby was
completely removed from its mother and even the placenta
was removed. A factual question was presented and the
opinion of the autopsy physician was evidence which could
be considered by the jury. His opinion was that the baby was
born alive and that it breathed and had heart action. He
gave good reasons for that opinion and while he admitted that
there could be a possible doubt his evidence justifies the infer-
ence that there was no valid ground for a reasonable doubt.
While he admitted that he had not used certain tests sug-
gested by the other doctor he stated that he knew of these
tests but he did not consider them necessary here. With re-
spect to the test most relied upon by the defense, it was stated
by both doctors that this test would show only what the
autopsy physician testified he had discovered by other means.
The doctor called by the defense had not seen the baby's body
and his testimony was based upon his general laboratory ex-
perience. While it may be said that there was some conflict
between the testimony of these two doctors no more than a
conflict appears. The question was one of fact for the jury
and, in our opinion, the evidence is sufficient to support its
findings. If it could be said that there might be a possible
doubt with respect to this phase of the case, it cannot be said
that there was necessarily a reasonable doubt. The finding of
the jury is sufficiently supported, and the implied finding that
this was a human being rests on a factual basis and not upon
speculation.

The appellant further contends that the evidence is
insufficient to show that the death of this infant was caused
by a criminal act. It is argued, in this connection, that the

autopsy surgeon was unable to state precisely what caused the death of the infant and that it follows that the question as to the cause of the death rests on speculation and conjecture. It is pointed out that this doctor gave as the cause of death both suffocation and hemorrhage from an untied umbilical cord, and that he admitted that it was very difficult to determine which of these actually caused the death. He described the conditions he found in the body of the infant, including certain things which indicated that suffocation had taken place and other things which indicated an excessive hemorrhage. While he testified that the cause of death was very likely hemorrhage he later stated that it could be both of these things. He reaffirmed his opinion that one or both of these things caused the death although he admitted the possibility that the baby could have died of brain hemorrhage, saying "anything is possible." This doctor expressed a fixed opinion that the death resulted from one or both of these things and gave substantial reasons for that opinion. The fact that he was unable or unwilling to attribute the death to one of these causes alone does not make this evidence mere speculation or conjecture, and does not affect the question as to whether the death resulted from a criminal act.

There is ample evidence that such was the case. Penal Code section 192 defines involuntary manslaughter as the unlawful killing of a human being "in the commission of a lawful act which might produce death . . . without due caution and circumspection." ■ The failure to use due care in the treatment of another where a duty to furnish such care exists is sufficient to constitute that form of manslaughter which results from an act of omission. (*People* v. *Montecino*, 66 Cal.App.2d 85 [152 P.2d 5].) ■ While the circumstances here are distressing, the evidence indicates a complete failure on the part of the appellant to use any of the care towards this infant which was necessary for its welfare and which was naturally required of her. While it is conceivable that in some such cases the mental and physical condition of a mother, at the time, might prevent her from exercising that reasonable care which would ordinarily be required, and thus excuse her from blame for the consequences of her failure to act, no such situation here appears. The appellant's own testimony discloses not only that she had a full realization of the situation but that she was able to think clearly and act with definite ends in view. With plenty of assistance near at

hand she intentionally chose not to call for any help. Although she knew that the baby had dropped into the toilet she made no effort to rescue it or care for it for some time. Knowing that the placenta should be removed she gave her first attention to that. Even after that was accomplished she got up, turned on the light and proceeded to care for herself. Only after this was done and some seven minutes after the baby was born did she pick up the infant and make any effort to observe its condition. Even then her actions were very perfunctory and she made no effort to do anything, or to call for aid, in order to take care of the baby and attempt to preserve its life. She then let it remain on the floor in a cold room for some fifteen minutes while she attended to other things, after which she put it in a newspaper and hid it under the tub. Even the appellant's own medical expert testified that a child born under these circumstances would die. The evidence is entirely sufficient to show that the death of this infant was caused by a criminal act.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 6, 1947.