173 N.J. Super. 75 (1980)
413 A.2d 611
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WINFIELD ANDERSON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1979.
Decided March 20, 1980.
*76 Before Judges MATTHEWS, ARD and POLOW.
Glenn A. Zeitz argued the cause for appellant (Stanley C. Van Ness, Public Defender, attorney; James K. Smith, Jr., Assistant Deputy Public Defender, of counsel and on the brief).
Dennis G. Wixted, Assistant Prosecutor of Camden County, argued the cause for respondent (John B. Mariano, Camden County Prosecutor, attorney).
PER CURIAM.
Defendant was indicted, tried and convicted of the murder of John Lee Spearman while armed (counts 1 and 2); the murder *77 of Jonathan Lee Spearman while armed (counts 3 and 4); atrocious assault and battery on Nikki Spearman (count 5); possession of a firearm without a permit to carry same (count 6); robbery of John Stewart while armed (counts 7 and 8); assault with an offensive weapon on Forrest Trotter (count 9), and assault with intent to kill Forrest Trotter (count 10). After the convictions, counts 5, 7 and 8 were merged with the convictions on counts 1 and 3, and the conviction on count 9 was merged with the conviction on count 10. Defendant was sentenced to the New Jersey State Prison to two concurrent life terms on counts 1 and 3; an 8 to 10-year sentence on count 2, to be served consecutive to the first count; an 8 to 10-year sentence on count 4, to be served concurrent with the sentence imposed on count 2; a 3 to 5-year sentence on count 6 to run concurrent with the sentence imposed on count 1, and a 5 to 7-year sentence on count 10, to be served consecutive with the sentence imposed on count 6.
The record discloses, and the jurors could have found, the following facts. On March 9, 1975 John Stewart, who resided with his girlfriend Nikki Spearman, who was then 7 1/2 months pregnant, was at home. Shortly before noon Forrest "Rick" Trotter, a friend of Stewart's, came by to return a record album to Stewart. They sat and smoked marijuana while listening to records for a short time (Spearman was resting upstairs).
According to Stewart, two men, one of whom was defendant, came to the door between 1 and 1:30 p.m. Since Stewart and Spearman had been selling marijuana at that time, Stewart asked Spearman to come downstairs to see if she could identify the men at the door. Stewart had apparently never seen them before. Spearman could not identify them either.
After the two men entered the house they told Stewart that they had heard that he was selling good marijuana and that they wished to purchase a quarter-pound. Trotter remained *78 seated on a chair in the living room, and Nikki Spearman was somewhere on the staircase leading upstairs.
Stewart decided to negotiate with the two men and permitted them to sample his marijuana. The men, not including Stewart, smoked two joints, and indicated that they wished to purchase some.
Spearman then went upstairs to prepare the marijuana for sale. Stewart then went upstairs and brought the marijuana into the kitchen. Stewart attempted to find out who the two men were, and after being unsuccessful told them that he had decided that he did not want to do business with them. Defendant then pulled a revolver from his waistband and asked for money while he held the gun on Stewart. The second man, armed with a blackjack, went into the living room to get Trotter. Trotter broke for the stairs, knocking Spearman off balance. Defendant fired his revolver, intending to hit Trotter, but struck Spearman in the abdomen. Stewart heard Spearman cry, "Oh, my baby," which she repeated over and over, but he could not see her, since he had dived under the kitchen table in an attempt to grab the gunman's leg.
The second man took Stewart upstairs in search of money. Stewart gave him $300 and a suitcase full of marijuana. When the second man attempted to get Stewart to come back downstairs, Stewart reached into his dresser drawer pretending to be reaching for a weapon. The second man ran downstairs, and the two intruders ran out the front door.
After being shot Spearman went upstairs into the bathroom to try to stop the flow of blood from her wound. After the two men left Stewart drove her to the hospital and advised her not to say anything about the marijuana deal. The police came to the scene and took Stewart with them to the police station. Trotter, who had concealed himself in a closet after the shooting, left the house and then returned with a friend to clean up the marijuana which had been left there.
*79 At the police station, a taped statement narrating the events surrounding the shooting, but which omitted any references to the proposed drug deal, was taken. At that time Stewart described the gunman as being about 5'9" to 5'10" tall, having a light mustache and wearing "suit pants and sneakers." Trotter described the same man as wearing a "pair of coveralls, blue jeans" and being about 6' tall. Stewart testified at trial that the two assailants had been at his home for "something like" an hour to an hour and a half, while at the Wade hearing, he testified that they had been there for about half an hour.
At the hospital Spearman was first examined by a doctor who called her obstetrician, Dr. Jung. Dr. Jung had examined Spearman at his office about four days prior to the shooting and had found her condition to be quite normal. After examining Ms. Spearman, he determined that she was approximately 30 weeks pregnant and that she had been shot in the abdomen. In order to determine the severity of the damage caused by the wound, the doctors concluded that an operation was necessary.
The operation was performed, and it was found that Spearman had suffered no serious injuries herself, but that the uterus had been struck, resulting in a wound from which amniotic fluid was leaking. The doctors found that it was necessary to perform a Caesarian section, in order to ascertain what damage, if any, had been inflicted on the fetus. It was estimated that there was a 50% chance that the baby would survive at 7 1/2 months. The operation was performed and twin sons were removed from Ms. Spearman's womb. One baby appeared normal except for its small size. The second child was equally small, but had a fresh wound in the middle of its back. The children were rated on the APGAR scale, which is determined by the baby's appearance, pulse, muscle power, reflection and respiration, in order to determine its vital functions. Out of a maximum score of 10, the first baby scored 9, at one minute and *80 five minutes after birth, while the second child was rated at 2 after one minute, and 5 at five minutes. The second child had fair heartbeat and respiration.
After delivery, Dr. John Tedeschi, a pediatrician, began treating the twin infants. Tedeschi noticed that both were "in apparent respiratory distress" and both had been "incubated which means they had started with an artificial respiratory means." They both were alive and able to breathe on their own at birth. After one hour the first child was taken off the respirator for about 12 hours, and then placed back on the respirator for the last two hours of its life. The wounded twin needed respiratory assistance for the entire three hours of its life.
According to Dr. Tedeschi, both babies suffered from "hyaline membrane disease" which is due to immaturity. This is a disease which severely inhibits respiration in premature babies and babies born by Caesarian section. The autopsy performed by Dr. Read determined that the first twin had died as a result of immaturity, which he clarified as meaning that the child's organs had not developed to the point where they were capable of sustaining life. He also determined that the second twin had died as a result of the bullet wound to his back.
In the course of the investigation conducted by the Camden police, Trotter and Stewart were shown hundreds of photographs over a period of several days. Finally, on March 13, 1975 Trotter picked out defendant's photograph from a set of ten pictures, and identified him as the gunman. However, he did not sign the photograph because as Detective Charles, the chief investigator in the case, stated, "... after looking at so many photographs we were not certain it could be the person and we wanted a verification from another witness." Trotter was purposely being held at this time within the office complex of the Camden County Prosecutor, Stewart was in the Camden County Jail, and Spearman was still recuperating at Cooper Hospital.
*81 After Trotter's identification the same set of ten photographs were shown to Stewart, who also chose the picture of defendant. He then signed and dated the photo. Trotter also then signed the picture. Spearman, who had previously been uncooperative with the police, also picked out defendant's photograph from the same set of ten pictures. Sometime afterwards, while visiting with a friend, Spearman picked defendant out of a junior high school class photograph.
Prior to selecting defendant's photograph, Stewart had aided in the sketch by New Jersey State Police composite sketch artist George Homa of two drawings approximating the facial features of defendant and his accomplice. Defendant was positively identified in court by Trotter, Spearman and Stewart as the gunman who shot Ms. Spearman.
Defendant did not testify at trial. His defense was one of alibi, and he presented five witnesses who testified in support of that defense.
After summation by counsel and the charge by Judge Wingate, the jury retired to consider their verdict. The jurors deliberated for six hours on the first day. Overnight, one of the jurors became seriously ill and was excused. An alternate juror was impanelled, and the jury was instructed, "[k]indly resume your deliberations." No instruction was given to the jury to begin their deliberations anew, as if they were entering the jury room for the first time. Four hours and 20 minutes later the jury returned a verdict of guilty on all counts.
At the close of all the evidence, defense counsel moved for a judgment of acquittal, claiming, among other things, that the twins were not "persons" at the time of the shooting. The motion was denied by Judge Wingate, who subsequently filed a written opinion memorializing his ruling which is reported in State v. Anderson, 135 N.J. Super. 423 (Law Div. 1975).
Pursuant to our order of June 29, 1976 Judge Wingate held a hearing on a motion for a new trial based upon the allegation that the prosecution failed to provide defense counsel with full *82 discovery. Defendant claimed that he had not been provided with the statements of several witnesses which were in the possession of the prosecutor.
After hearing testimony the trial judge determined that the prosecutor's office had violated R. 3:13-3(a) through inadvertence, but that the omitted statements were not "material," and he consequently denied the motion for new trial.
Pursuant to another order entered August 30, 1977 we again remanded the case to the trial court for hearing of a motion for new trial based upon the recantation of Forrest Trotter. Trotter was the only witness at that hearing and he testified, against the advice of his attorney, that he believed he had made an "honest mistake" in his identification of defendant. He stated that he began to doubt his identification on the first day of trial, and that he had asked a court attendant to bring the prosecutor so that he could discuss the matter with the prosecutor, but that no meeting took place. Trotter claimed that while he was walking down a Camden street with a friend he saw the real perpetrator, but that he did not know his name. Trotter made no attempt to notify the authorities of his misidentification. On cross-examination Trotter admitted that he said nothing about this matter until he had spoken to defendant's counsel. He stated that he was not coerced into recanting, although he was incarcerated with defendant's friends at Yardville. Judge Wingate found the recantation unbelievable and denied the motion.
On appeal defendant argues that (1) he should be granted a new trial because of the prosecutor's failure to disclose seven signed statements procured from potential witnesses; (2) he should be granted a new trial based upon Forrest Trotter's recantation; (3) it was reversible error for the trial judge to have permitted the introduction of the autopsy photographs of the deceased infants because they were prejudicial; (4) the sentences imposed are manifestly excessive, and (5) the motion for judgment of acquittal on the murder counts should have *83 been granted because the Spearman infants were never capable of maintaining a separate and independent existence, as required by the common law rule of infanticide.
In view of our disposition of this appeal, we find it unnecessary to deal with the first four points raised by defendant. As to the fifth point, we agree with the reasoning expressed by Judge Wingate in his opinion published at 135 N.J. Super. 423 and affirm his determination.
As indicated above, one of the jurors was taken ill overnight, after the jury had deliberated for more than six hours. In impanelling the new juror, the following colloquy took place:
THE COURT: All right. Well, then, if there's no objection we will draw one of the two remaining alternates.
THE CLERK: Juror No. 72, seat 5, Frank Weismann.
THE COURT: Mr. Weismann, will you take that position please, which would be juror number 4. Now, that completes of course the filling of the jury, restoring it to its original strength of twelve. Mr. Weismann, of course, you are as much a part of this jury as any other juror. You have been present through the entire proceedings. Each and every time that the jury was brought down for any reason whatsoever you were here. You heard the question propounded by the jury. You heard the answer given to the jury and the testimony that was read. So there's no reason why you are not fully informed and you may join in the deliberations.
That being the situation, ladies, and gentleman, I would ask you if you would kindly resume your deliberations and you may retire for that purpose taking with you the exhibits which I presume the clerk is now getting and I would like counsel to again satisfy themselves as to the accuracy of those exhibits. Counsel, please check the exhibits.
The instruction to begin deliberations anew, as required by R. 1:8-2(d) and State v. Trent, 79 N.J. 251 (1979), was not given. In Trent the court held that absence of any instruction at all on the necessity of the jurors to recommence deliberations once an alternate juror has been substituted for an original juror during deliberations constitutes plain error requiring reversal. Id. at 257.
*84 While this issue was not raised by either party on appeal, R. 2:10-2 permits us to "notice plain error not brought to the attention of the trial or appellate court." We believe that the interests of justice require us to take notice of the apparent error. At our direction we have been provided with supplemental briefs on the issue both by the State and defendant.
The State concedes in its supplemental brief that the questioned instructions violated State v. Trent because the jurors were not told to begin their deliberations anew. However, the State suggests that the Trent decision ought to be applied prospectively only. Defendant disagrees and submits that Trent is entitled to full retrospective application.
Generally, it has been said that "the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based." Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 728, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966). Rather, the decision whether a new rule of law should be retroactive is primarily one of policy, for "the Constitution neither prohibits nor requires retrospective effect." Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965).
The criteria used to resolve the question of retroactivity are set forth in Johnson v. New Jersey, above: (a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. 384 U.S. at 728, 86 S.Ct. at 1772. See, also, State v. Howery, 80 N.J. 563, 569 (1979). However, where the new rule is designed to overcome an aspect of the criminal trial that substantially impairs its truth-finding function, *85 it is generally given retroactive effect. United States v. Peltier, 422 U.S. 531, 535, 95 S.Ct. 2313, 2316, 45 L.Ed.2d 374 (1975).
Comparing the present case with the criteria set forth in Stovall v. Denno, Peltier and other cases, we believe that Trent should be applied retroactively. First, the purpose of the rule is to protect the integrity of a jury verdict by ensuring that each juror participates in every stage of the deliberations. State v. Trent, above, 79 N.J. at 256. As we noted in State v. Lipsky, 164 N.J. Super. 39, 46 (App.Div. 1978), failure to give the Trent instruction "represents a substantial invasion of the defendants' right to a jury trial which taints the integrity of the verdict." Obviously, what is involved here is not merely a prophylactic rule designed to prevent police misconduct, it is an attempt to protect "[the] fundamental right of fair and impartial jury deliberations ..." State v. Trent, 79 N.J. at 257.
Secondly, there has not been any reliance by law enforcement personnel or others on what might be termed the former rule of law. At the time of the trial in this case, July 1975, R. 1:8-2(d) provided only that when "a substitution of an alternate juror is made, the court shall give the jury such supplemental instructions as may be appropriate." (Emphasis supplied). However, as the State notes, there was no prior law in New Jersey defining what constituted an appropriate instruction until the decision in State v. Miller, 76 N.J. 392, 407 (1978). Thus the trial judge cannot be said to have "relied" on the prior law, since, in reality, there was no prior law. Compare State v. Howery, above, where the trial court had relied on the decision in State v. Petillo, 61 N.J. 165 (1972), cert. den. 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973), which was subsequently overruled by Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).
*86 Thirdly, retroactive application of Trent would have minimal impact upon our judicial system. Replacement of a juror during the course of the jury's deliberations is not a common occurrence. Thus, while there may be a few reversals if Trent is applied retroactively, we do not anticipate a situation where the courts will be inundated with defendants seeking new trials as a result of faulty jury instructions.
Finally, the Trent rule is directly concerned with the truth-finding aspects of a criminal trial. As noted, by requiring all of the jurors to participate in all aspects of the deliberation process, the Trent rule is designed to guarantee the integrity of the jury verdict. State v. Lipsky, above, 164 N.J. Super. at 46. See, also, Witherspoon v. Illinois, 391 U.S. 510, 523, n. 22, 88 S.Ct. 1770, 1777 n. 22, 20 L.Ed.2d 776 (1968), where the court found that an Illinois rule excluding potential jurors with reservations about the death penalty also undermined "the very integrity of the [jury selection] process," and thus it made its ruling abolishing the rule "fully retroactive." Obviously, any defect in a criminal trial relating to the selection and instruction of the jury casts doubt on the accuracy of the verdict. Cf. State v. Singletary, 80 N.J. 55, 62 (1979). We conclude that retroactive application of the Trent rule is fully warranted.
In view of our conclusion that the supplemental instructions to the jurors were prejudicially defective, we are constrained to reverse the convictions and remand the case for a new trial. We affirm, however, Judge Wingate's decision on the motion for judgment of acquittal, substantially for the reasons expressed by him in his opinion which is reported in 135 N.J. Super. 423.