STATE of Wisconsin, Plaintiff-Appellant,

v.

Maurice J. CORNELIUS, Defendant-Respondent. †

Court of Appeals

*No. 89-0446-CR. Orally argued August 29, 1989.—Decided September 12, 1989.*

(Also reported in 448 N.W.2d 434.)

† Petition to review denied.

For plaintiff-appellant, there were briefs submitted by *Donald J. Hanaway,* attorney general, and *Thomas J. Balistreri,* assistant attorney general, and oral argument by *Thomas J. Balistreri.*

For defendant-respondent, there was a brief filed by *Henry R. Schultz,* first assistant state public defender and *Mary E. Weitrovich,* first assistant state public defender and oral argument by *Henry R. Schultz.*

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. The state appeals the dismissal of two counts of homicide against Maurice Cornelius at the completion of the preliminary hearing. Cornelius' homicide charges stem from an auto accident that fatally injured a fetus. The parties dispute whether the fetus died prior to or after its birth. The trial court held that the fetus was not born alive and therefore could not be considered the victim of a homicide. The court also

found that even if the infant had survived for some period independently of his mother, as a matter of law no homicide had been committed. We disagree and accordingly reverse and remand for reinstatement of the charges.

Cornelius had spent most of April 24, 1987, drinking at various bars with his girlfriend, Sherry Wheelock, and other friends and family. At some point, an argument broke out between Cornelius and Wheelock, and she alleges that he forced her to go on a "death ride" or "scare ride" with him. During this ride, the car left the road and struck a telephone pole, severely injuring its two occupants. Both Cornelius and Wheelock survived the accident. Cornelius was later found to have a blood alcohol level of .17%, well above the legal limit.

At the time of the accident, Wheelock was approximately seven months pregnant with Cornelius' child. When she reached the hospital, doctors observed that she had suffered trauma to her abdomen and also found the fetal heart rate to be abnormally low. They elected to perform a cesarean section. The infant, named Robert Maurice Cornelius, was very limp, very pale, and in extremely poor condition at birth. This was due to the fact that the placenta had detached from the womb, depriving the fetus of oxygen for some unknown period of time. The infant did have a heartbeat and was attempting to breathe. He was placed on artificial respiration, and his condition improved somewhat.

A brain wave test (electroencephalograph or EEG) performed on the following day revealed no evidence of brain wave activity. The infant showed no response to stimuli and exhibited no movement of his own. Two days after the accident, his heart and lungs failed and he was pronounced dead.

Based on his role in the accident, Cornelius was charged with homicide by intoxicated use of a motor vehicle, homicide by the use of a motor vehicle with a blood alcohol level in excess of 0.1%, injury by intoxicated use of a motor vehicle, and injury by the use of a motor vehicle with a blood alcohol level in excess of 0.1%. Cornelius challenged the homicide charges and moved that they be dismissed. The trial court granted that motion, and the state appeals.

There is some confusion over the exact procedural nature of the trial court's disposition of the homicide charges. Our reading of its decision is that the charges were dismissed because the complaint was insufficient and, as an alternative ground, because the evidence presented at the preliminary hearing was insufficient to support them. However, we need not delve into a lengthy discussion of the standard of review because, for the purposes of this appeal, the facts are undisputed. The application of the law to undisputed facts is a question of law that we review de novo. *Hainz v. Shopko Stores, Inc.,* 121 Wis. 2d 168, 172, 359 N.W.2d 397, 400 (Ct. App. 1984). The role of the judge at a preliminary hearing is to determine whether the facts and reasonable inferences that may be drawn from them support the conclusion that the defendant probably committed a felony. *State v. Dunn,* 121 Wis. 2d 389, 398, 359 N.W.2d 151, 155 (1984). A preliminary hearing is not the proper forum to choose between conflicting facts or inferences, or to weigh the state's evidence against evidence favorable to the defendant. *Id.* Probable cause at a preliminary hearing is satisfied when there exists a believable or plausible account of the defendant's commission of a felony. *Id.*

Section 939.22(16), Stats., defines "human being" when used in the homicide statutes as meaning one who has been born alive. Therefore, the first issue we address is whether Robert was "born alive" within the meaning of sec. 939.22(16). The trial court, relying on deposition testimony brought out at the preliminary hearing, held that he was not. The court determined: "[The fetus] was brain-dead upon delivery. After delivery, the child survived only because its system was artificially oxygenated by machinery. There was never any evidence of cerebral brain function."

It is unclear how the trial court defined "born alive." That term has apparently not been interpreted in the state since *Heubner v. State,* 131 Wis. 162, 111 N.W. 63 (1907). *Heubner* relied on the fact that tissue samples and other physical evidence indicated that the infant had drawn breath outside the womb. *Id.* at 165, 111 N.W. at 64. From this, the court in *Heubner* concluded that the child had been born alive.

There have been advances in the field of medicine since 1907, and our law, to some extent, reflects those advances. Although the legislature has never defined "born alive," it has chosen to define death in sec. 146.71, Stats. We accept as axiomatic the legal, if not medical, proposition that if one is not dead, he is indeed alive. We therefore apply the criteria of sec. 146.71 to determine whether the infant was born alive.[1]

---

[1]Cornelius urges us to ignore sec. 146.71 and instead apply a broader, judicially-created definition of "born alive" based on an inquiry into the infant's longer term viability. There are persuasive policy reasons for doing so, although we believe that the confusion that would be created by several different definitions of "life" and "death" outweighs them. In any event, it is the legislature's role to weigh these various arguments and establish the public policy of this state. In the absence of evidence to the

Section 146.71 provides:

**Determination of death.** An individual who has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death shall be made in accordance with accepted medical standards.

Once we determine that sec. 146.71 is applicable, this first issue is easily resolved. The infant was not dead under the first set of criteria because at birth he had not suffered an irreversible cessation of circulatory and respiratory functions. The child had an independent heartbeat, which alone is enough to establish that he had not sustained "irreversible cessation of circulatory . . . functions." We note additionally that the evidence shows the infant breathed fitfully when placed on a respirator and that the child's heart and lungs continued to function for almost two days.

We therefore turn to the second portion of the statute that states that cessation of brain activity is also an indicator of death. The medical testimony indicates that the infant's behavior, especially his attempt at respiration, are indicative of brain stem activity. Cornelius conceded this point at oral argument and instead took the position that the criteria for determining whether a child was born alive should include higher level brain functioning measurable by an EEG. As stated earlier, the legislature has made the determination that brain stem activity is sufficient to indicate "life" and, based on the uncontroverted medical testimony that brain stem activ-

---

contrary, we must assume the legislature was aware of the impact of sec. 146.71 on a large number of laws dealing with death, and we will not ignore the statute merely because its primary focus was not directed at this specific fact situation.

ity existed, it was error to find the infant "brain dead" under sec. 146.71.[2]

Next, Cornelius contends that even if the infant was "born alive," the charges against him are inappropriate. He alleges that the homicide statutes in question were not intended to apply to the situation where the fatal injury was caused while the victim was still a fetus. The trial court agreed with this argument and found the complaint insufficient to support the homicide charges.

██

After reviewing the applicable statutes, we find that they unambiguously allow for the charges against Cornelius. Interpretation of a statute is a question of law that we review without deference to the trial court. *Estate of Habelman,* 145 Wis. 2d 228, 232, 426 N.W.2d 363, 365 (Ct. App. 1988). Section 940.09(1)(a) and (b), Stats.,[3] under which Cornelius was charged, requires that he cause the death of "another." The language of the stat-

---

[2]This opinion should not be construed to bar Cornelius from arguing at trial that no brain stem activity existed. Any admissions made on this point were for the purposes of this appeal only, and should Cornelius choose to dispute the medical testimony, this factual determination should properly be made by a judge or jury on remand.

[3]Section 940.09(1)(a) and (b) provide:

**Homicide by intoxicated user of vehicle or firearm. (1)** Any person who does either of the following under par. (a) or (b) is guilty of a Class D felony:

(a) Causes the death of another by the operation or handling of a vehicle, firearm or airgun and while under the influence of an intoxicant;

(b) Causes the death of another by the operation or handling of a vehicle, firearm or airgun while the person has a blood alcohol concentration of 0.1% or more by weight of alcohol in that person's blood or 0.1 grams or more of alcohol in 210 liters of that person's breath.

ute indicates that "another" refers to another person or, synonomously, another human being. As mentioned earlier, sec. 939.22(16) defines a human being as "one who has been born alive."

Simply put, then, to be convicted under these statutes, Cornelius must have caused the death of someone who was born alive. This is precisely what he is charged with doing. The statutory language does not place any limitations on the nature or timing of the cause of death, and neither will we. Cornelius is free to make the argument at trial that the causation was too attenuated for him to be found guilty, and the jury is free to accept or reject that argument. We do not find it to be true as a matter of law.

We note that both the state and Cornelius discuss at length the common-law rule that one who fatally injures a fetus, which is later born alive and dies, has committed homicide.[4] And, had the legislature not defined "human being" in sec. 939.22(16), we would have applied the "born alive" rule to fill that void. Wisconsin certainly had this common-law rule, as the earlier cited *Heubner* case indicates. Although the legislature abolished common-law crimes, sec. 939.10, they retained common-law rules not in conflict with the criminal code. *See also State v. Williquette,* 129 Wis. 2d 239, 259–61, 385 N.W.2d 145, 154–55 (1986). The "born alive" rule is not a common-law crime. It does not proscribe any specific conduct or mandate any punishment. It is merely a rule

---

[4]Cornelius implies that this rule never gained universal acceptance. However, while there may have been a disagreement between a few commentators, the vast weight of authority demonstrates that this was the rule at common-law, and apparently the rule in all American jurisdictions. *See* 3 Coke, *Institutes,* *50 (1648); *see also* cases cited at note 5.

to determine when an alleged victim becomes a separate being for the purpose of a homicide prosecution. Wisconsin apparently codified this common-law rule in sec. 939.22(16). However, if sec. 939.22(16) did not exist, we would have applied the common-law "born alive" rule much as the Illinois Supreme Court did in *People v. Greer,* 402 N.E.2d 203, 209 (Ill. 1980), when it was without legislative guidance. Thus, while the result is the same as if the common-law rule had been applied, we are able to reach it on purely statutory grounds.

Although we need not go beyond the statutory language, two other factors buttress our decision. The first is that this decision places Wisconsin in the line with the vast majority of other jurisdictions. While we decide this issue based on Wisconsin's own statutory scheme, it is worth noting that with one exception *every* jurisdiction that has faced this issue has concluded that the death of an infant as a result of fetal injuries constitutes homicide.[5]

---

[5] *See, e.g., United States v. Spencer,* 839 F.2d 1341 (9th Cir.), *cert. denied,* 108 S.Ct. 2908 (1988); *Ranger v. State,* 290 S.E.2d 63 (Ga. 1982); *People v. Bolar,* 440 N.E.2d 639 (Ill. App. 2d 1982); *Williams v. State,* 550 A.2d 722 (Md. Ct. Spec. App. 1988); *cert. granted,* 553 A.2d 706 (Md. 1989); *State v. Anderson,* 343 A.2d 505 (N.J. Super. Ct. Law Div. 1975), *rev'd on other grounds,* 413 A.2d 611 (N.J. Super. Ct. App. Div. 1980); *rev'd after remand on other grounds,* 426 A.2d 1019; and cases and authorities cited therein. *Cf. Cordes v. State,* 112 S.W. 943 (Tex. Crim. App. 1908).

Jurisdictions are split over whether the destruction of a viable fetus is homicide. However, this is a separate question that we need not address. *See, e.g., Commonwealth v. Cass,* 467 N.E.2d 1324 (Mass. 1984) (killing of viable fetus constitutes homicide); *State v. Soto,* 378 N.W.2d 625 (Minn. 1985); *State v. Willis,* 652

Second, this decision harmonizes, to some extent, differences between civil and criminal liability. A child who is born alive has a civil claim for injuries sustained prior to birth. *Kwaterski v. State Farm Mut. Auto Ins. Co.,* 34 Wis. 2d 14, 18, 148 N.W.2d 107, 109 (1967). *Kwaterski* suggests that this civil liability was originally derived from the similar criminal rule. *Id.* at 17, 148 N.W.2d at 109. Although in many instances there are good reasons for differences between rules involving criminal and civil liability, we see no pressing rationale for such a distinction here. Cornelius' strongest argument on this point is that in civil law we are merely shifting liability to the most blameworthy party, but in this case we allow Cornelius to be charged with a crime, despite numerous contingencies that he neither anticipated nor could control. However, we see little difference between this case and many other instances where the success or failure of modern medicine may be the determinative factor in whether the defendant faces homicide or a lesser charge. That these factors were beyond Cornelius' control does not negate a possible finding of criminal culpability.

One issue that should be addressed briefly is the interplay between this decision and the current controversy over abortion law. Although the trial court cited *Roe v. Wade,* 410 U.S. 113 (1973), for the proposition that a fetus does not have the same "rights" as a human being, we do not see the relevance of that decision or the more recent case of *Webster v. Reproductive Health Servs.,* 109 S.Ct. 3040 (1989). Our decision does not reach the issue of the rights of a fetus, and certainly does not discuss its rights vis-a-vis the mother. Robert was

P.2d 1222 (N.M. Ct. App. 1982) (killing of viable fetus not homicide); *State v. Horne,* 319 S.E.2d 703 (S.C. 1984).

born alive and died as a result of injuries sustained in utero, and our decision should not be read more broadly than to allow a homicide charge under these circumstances.

Finally, Cornelius asks us to make our holding prospective only. In support of this request, he cites two cases where courts found the destruction of a viable fetus to be governed by homicide laws, but applied this rule prospectively.[6] Our decision is not, as those were, an unanticipated divergence from the past laws of the state, and the statutes clearly allow the charge on their face. Therefore, because the undisputed facts establish that there is probable cause to believe that these alleged homicide charges had been committed, we reverse and remand this case for proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.

---

[6]*See Horne,* 319 S.E.2d at 703; *Cass,* 467 N.E.2d at 1324.