[No. B051570. Second Dist., Div. One. Jan. 31, 1992.]

THE PEOPLE, Plaintiff and Appellant, v.
SCOTT ERIC FLORES, Defendant and Respondent.

## COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan and Eugene D. Tavris, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Patrick Thomason and Henry J. Hall, Deputy Public Defenders, for Defendant and Respondent.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

The People appeal from an order granting defendant Scott Eric Flores's motion pursuant to Penal Code section 995 to set aside an information charging him with gross vehicular manslaughter while intoxicated in violation of Penal Code section 191.5, subdivision (a).

### STATEMENT OF FACTS

At approximately 7 p.m. on January 28, 1990, defendant's Volkswagen, traveling southbound on the Long Beach Freeway at an estimated speed of 75 to 80 miles per hour, failed to make a curve it was approaching. The Volkswagen swerved as it made overcorrections in rounding the curve; ultimately, it went over the center divider into the oncoming traffic. Sylvia Bacon (Bacon) was traveling northbound on the Long Beach Freeway when she saw the Volkswagen coming through the air toward her from the opposite side of the center divider. The Volkswagen hit her automobile head-on, which caused her to apply her brakes and her automobile to spin, coming to rest in the middle of the freeway.

At the time of the accident, Bacon was approximately eight and one-half months' pregnant. Immediately after the collision, Bacon had an abdominal contraction and felt nauseated. Additionally, her nose bled and she suffered cuts and bruises to her arms and hip. Bacon was transported to St. Mary's Hospital in Long Beach.

Shortly after the accident, Long Beach Police Officer Hector Nieves saw defendant standing next to the Volkswagen which had been involved in the collision. While Officer Nieves did not notice anything unusual about defendant's appearance or behavior at that time, he later noticed defendant was

exhibiting signs of intoxication. At Officer Nieves's direction, a nurse withdrew a blood sample from defendant at approximately 9 p.m. on January 28, 1990. When it was analyzed, the blood sample showed defendant had a blood-alcohol level of .18.

Defendant told Long Beach Police Officer Pamela Davidson that he was driving southbound on the Long Beach Freeway at approximately 60 miles per hour when he felt his Volkswagen pull to the right. He then overcompensated and saw the center divider wall approaching him from the left. He ducked and the Volkswagen crashed.

An emergency Caesarian section was performed on Bacon at approximately 10 p.m. on January 28, 1990. Cindy Chen, M.D., a neonatologist and pediatrician, attended the procedure which was performed by a gynecologist, Dr. Sohl. After a female fetus/infant[1] was removed from Bacon's uterus and the umbilical cord was tied, it was given to Dr. Chen. Approximately two minutes elapsed before Dr. Chen received the fetus/infant and conducted an examination.

Upon examining the fetus/infant, Dr. Chen determined that it was not breathing or moving; it was pale and in shock. She thought the fetus/infant was dead until an attending nurse informed her that there was a very faint, slow heart tone of less than 20 beats per minute. The fetus/infant never had any independent respiration. Upon ascertaining that there was a heartbeat, Dr. Chen intubated the fetus/infant and forced air into its lungs. This, however, is not breathing. When Dr. Chen checked the heart rate of the fetus/infant approximately two to three minutes after a heartbeat first was detected, there no longer was any heart tone at all. Dr. Chen continued to attempt the resuscitation of the fetus/infant for some 14 minutes. The fetus/infant was declared dead at 10:28 p.m.

Dr. Chen observed no abnormalities in or obvious physical trauma to the fetus/infant, which was full term. In her opinion, the very low heart rate was the result of the fetus/infant's inability to breathe; it had been in the process of dying for a while prior to the Caesarian section. Based on the presence of the occasional heartbeats, Dr. Chen characterized the birth medically as a "live birth."

Bacon had been examined by her gynecologist on January 20, 1990. He found her pregnancy to be progressing normally. At that time, Bacon was 38

---

[1]Both parties to this appeal place great emphasis on the semantics used in describing the product of Bacon's pregnancy. Since the question of whether this was a fetus or a living infant is the ultimate issue to be decided on appeal, it is appropriate to use both terms in the disjunctive until that issue is resolved.

weeks pregnant and the fetus had a heart rate of less than 40 beats per minute. Bacon's due date was February 14, 1990. Bacon had been admitted to the hospital from December 26 through December 29, 1989, for premature labor. She previously had given birth prematurely to an anencephalic infant.

Eva Hauser, M.D., the medical examiner, supervised the autopsy of the fetus/infant. It was a fully developed 6.3-pound female which appeared to be normal except for two extra fingers; these were mere tags of flesh and represented a trivial congenital birth defect. One of the fetus/infant's lungs was not functioning properly; it contained substantially less oxygen than did the other lung. The fetus/infant had been in distress prior to birth as evidenced by its aspiration of amniotic fluid. This indicated there was a problem with the fetus/infant or the placenta. Dr. Hauser observed no exterior or interior physical trauma.

Dr. Hauser formed the opinion that the fetus/infant died during the perinatal period, defined as the period immediately before, during and after birth, of undetermined causes and that the automobile accident Bacon had suffered was a contributing cause. The finding of death from undetermined causes was a function of the operation of a number of factors in a perinatal death, which normally permits no specific anatomical findings. There are three separate systems at work in perinatal deaths: the fetus or infant, the mother and the placenta. This means there normally will be a considerable variety of factors involved in a perinatal death and, at the autopsy stage, it generally is impossible to determine separately the precise operation of these factors. In Dr. Hauser's opinion, any traumatic stress to the mother could precipitate a distressed birth. She discerned no medical reason to believe the fetus/infant would have been born in a distressed condition had the automobile accident not occurred.

## CONTENTION

The People contend the superior court erred in granting defendant's motion pursuant to Penal Code section 995 to set aside an information charging him with gross vehicular manslaughter while intoxicated, in that there is evidence the fetus/infant allegedly killed was born alive and thus is a "human being" within the meaning of the manslaughter statutes. For the reasons set forth below, we disagree.

## DISCUSSION

■ In a proceeding under Penal Code section 995, the superior court "must draw every legitimate inference in favor of the information, and

cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate." (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) Consequently, on appeal, this court reviews directly the determination of the magistrate holding the defendant to answer. (*Ibid.*)

Defendant was charged with gross vehicular manslaughter while intoxicated in violation of Penal Code section 191.5, subdivision (a). As defined therein, "[g]ross vehicular manslaughter while intoxicated is the unlawful *killing of a human being* without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23152 or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." (Italics added.)

■ It is settled that "the term 'human being' within the ambit of the California homicide law means only a person who has been born alive and does not include within its meaning any type of unborn children. [Citations.]" (*People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 490 [142 Cal.Rptr. 830].) Moreover, the omission of the term "fetus" from the manslaughter statutes is an exercise of legislative judgment. (*Id.* at p. 491.) Hence, in this case as in *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 624 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], "[t]he dispositive question is whether the fetus which [defendant] is accused of killing was, on [the date of his act], a 'human being' within the meaning of the statute." *Keeler*, however, provides no direct guidance as to when a fetus or infant is "born alive"; in *Keeler*, the fetus, although developed to a stage of viability, was delivered stillborn with no air in its lungs. (*Id.* at pp. 623, 624.)

The case does, however, provide some indirect guidance, however unhelpful, by discussing the common law view of the matter. The court notes " 'the common law [of the mid-17th century] regarded abortion as murder only if the foetus is (1) quickened, (2) born alive, (3) lives for a brief interval, and (4) then dies.' [Citation.] . . . [¶] Against this background, a series of infanticide prosecutions were brought in the English courts in mid-19th century. In each, a woman or her accomplice was charged with murdering a newborn child, and it was uniformly declared to be the law that a verdict of murder could not be returned unless it was proved the infant had been born alive. . . . [¶] Of these decisions, some pointed out that evidence of breathing is not conclusive because that function may begin before the infant is fully born [citations], while others observed that the infant can possess an

'independent circulation'—one of the tests used to determine live birth—even though the umbilical cord may not yet be severed [citations]." (*Keeler* v. *Superior Court, supra,* 2 Cal.3d at pp. 625-627.)[2]

*Keeler* was preceded by *People* v. *Chavez* (1947) 77 Cal.App.2d 621 [176 P.2d 92], which is somewhat more helpful though not precisely on point. In *Chavez,* the mother was convicted of manslaughter in the death of a newborn. (*Id.* at p. 622.) That is, the acts of which she was accused occurred during and/or after birth. (See *id.* at pp. 622-623.) The court was asked to review the sufficiency of circumstantial evidence the infant was born alive, for it was not available for expert medical examination during or immediately after the birth process. (*Id.* at p. 623.)

Two to three minutes after the emergence of the fetus from the birth canal, it was limp and made no cry; the mother thought it was dead and therefore cut, but did not tie, the umbilical cord. (*People* v. *Chavez, supra,* 77 Cal.App.2d at pp. 622-623.) The medical testimony established the umbilical cord was untied and depleted of blood; the infant would live until it bled to death, a period of approximately one hour. The infant was full term and normal; the lungs were normal and had air in them. The body was nearly exsanguinated. In the opinion of the autopsy physician, the infant was born alive, in that there was air in the lungs and evidence of heart action, or pulsation, i.e., it had independent heart and lung action. (*Id.* at p. 623.) However, he acknowledged that these indicia of life could have occurred after the presentation of the head but before the birth process was completed. (*Id.* at p. 624.)

In considering whether this created a reasonable doubt as to whether the child was born alive, the *Chavez* court discussed the development and current state of the common law, noting it generally remained the case "that a child did not become a human being and could not be the subject of a homicide until it was completely born alive, was entirely separated from its mother and had an entirely independent life, with the cord cut and with its own breathing and heart action . . . , although in some of the more modern cases it has been held that the cutting of the cord was not necessary to this end." (*People* v. *Chavez, supra,* 77 Cal.App.2d at p. 625.) The court acknowledged the difficulty of determining the precise moment at which a fetus in the process of being born "becomes a human being in the technical sense," in that "normally, while still dependent upon its mother, the child, for some time before it is born, has not only the possibility but a strong

---

[2]As to murder, this is no longer the law in California. Penal Code section 187 was amended by Statutes 1970, chapter 1311, section 1 to include within the definition of murder the unlawful killing of a fetus.

probability of an ability to live an independent life. . . . While before birth or removal it is in a sense dependent upon its mother for life, there is another sense in which it has started an independent existence after it has reached a state of development where it is capable of living and where it will, in the normal course of nature and with ordinary care, continue to live and grow as a separate being." (*Ibid.*)

The *Chavez* court then concluded "[t]here is no sound reason why . . . a viable child in the process of being born [should not be considered] a human being within the meaning of the homicide statutes, whether or not the process has been fully completed. It should at least be considered a human being where it is a living baby and where in the natural course of events a birth which is already started would naturally be successfully completed." (*People* v. *Chavez, supra,* 77 Cal.App.2d at pp. 625-626.) Accordingly, "the question of whether death by criminal means has resulted while the process of birth was being carried out, or shortly thereafter, . . . should be . . . decided on the basis of whether or not a living baby with the natural possibility and probability of growth and development was being born, rather than on any hard and fast technical rule establishing a legal fiction that [it] was not a human being because some part of the process of birth had not been fully completed." (*Id.* at p. 626.)

On this basis, the court had "no hesitation in holding that the evidence is sufficient here to support the implied finding of the jury that this child was born alive and became a human being within the meaning of the homicide statutes." (*People* v. *Chavez, supra,* 77 Cal.App.2d at pp. 625-627.) Since the infant in this case at least was indisputably alive *during* the birth process, the court concluded there was no valid ground for a reasonable doubt whether it was born alive. (*Id.* at p. 627.)

Reduced to its essence, *People* v. *Chavez, supra,* stands for no more than the proposition that a killing in the course of the birth of a demonstrably alive and viable fetus is the killing of a human being to the same extent as is the killing of a fully born live child. (*People* v. *Smith* (1976) 59 Cal.App.3d 751, 755 [129 Cal.Rptr. 498].) Nothing in *Chavez* suggests the court would have reached the same result based on the age, or viability, of the fetus had there been no evidence of breathing and/or that the action of the heart had pumped blood into the tissues either during or upon completion of the birth process. Thus, contrary to the People's suggestion, *Chavez* does not stand for the proposition that a technically viable fetus is a human being if it is in the process of being born even though it exhibits no sign of life. (See *Keeler* v. *Superior Court, supra,* 2 Cal.3d at pp. 632, 636-638.) Rather, it must be living during a birth which, in the natural course of events, would be

completed successfully. (*People* v. *Chavez, supra,* 77 Cal.App.2d at p. 626; see *Keeler, supra,* at pp. 637-638.) Since there is no evidence in the instant matter as to the state of the fetus/infant *during* the birth process, *Chavez* provides guidance only insofar as it establishes that evidence of independent heart and lung action is sufficient evidence the infant was born alive.

The People argue that evidence the fetus/infant's heart beat after its delivery, albeit only weakly, occasionally and for no more than a very few minutes, is enough in itself to establish a live birth, citing Dr. Chen's medical opinion. In reviewing the common law of the 19th century, *Keeler* v. *Superior Court, supra,* 2 Cal.3d 619 does take note of a case in which the court instructed the jury that evidence of breathing was unnecessary, in that it was not uncommon for an infant not to breathe for a noticeable period after its delivery. (*Id.* at p. 626; see also *Morgan* v. *State* (1923) 148 Tenn. 417 [256 S.W. 433, 434].)

The statement must be considered in context, however. The cases reviewed in *Keeler* universally deal with charges of killing a newborn, i.e., acts occurring after birth, as does *Morgan.* In that context, that the allegedly criminal act precedes the infant's drawing of a breath assuredly does not establish that the infant is not yet born alive when it is killed. Where, as here, however, more than 14 minutes transpire and the fetus/infant *never* breathes, the situation is different. Heart action, or circulation, is not enough in itself to sustain life; there also must be respiration. Consequently, a faint heartbeat lasting only briefly generally is insufficient in the absence of other signs of life. (*State* v. *Green* (1989) 245 Kan. 398 [781 P. 2d 678, 681-682, 683].)

Conversely, if there is evidence of independent respiration, this generally establishes an independent circulation and existence. (*Morgan* v. *State, supra,* 256 S.W. at p. 434.) However, that a fetus/infant takes but a few spontaneous breaths and then immediately ceases breathing will not establish a live birth, i.e., an independent existence, for such evidence supports only the possibility and that is insufficient. (*Lane* v. *Com.* (1978) 219 Va. 509 [248 S.E.2d 781, 784].) Based on the foregoing authorities, we conclude the evidence of a faint, occasional heartbeat lasting no more than a very few minutes is insufficient in itself to support an inference Bacon's fetus/infant was born alive by common law standards.

 The People next argue there is evidence from which it reasonably can be inferred Bacon's fetus/infant did breathe independently and thus was born alive, citing Dr. Hauser's testimony that the autopsy revealed there was air in the lungs. However, Dr. Chen testified that she did not at any time

observe signs of independent respiration in the fetus/infant. After observing that it was neither breathing nor moving, was pale and in shock, but being informed it had a faint, occasional heartbeat, Dr. Chen intubated the fetus/infant, forcing air into its lungs. Her testimony that this does not qualify as breathing is undisputed. Given that there were no signs of respiration prior to the intubation which resulted in the forcing of air into the lungs, it cannot reasonably be inferred from the presence of air in the lungs that the fetus/infant ever breathed. The People assert the approximately two minutes which elapsed before Dr. Chen examined the fetus/infant means it is possible it breathed during that time. An absence of evidence as to what occurred during this two-minute interval is *not* evidence the fetus/infant *did* breathe. A conclusion it did breathe during this interval could only be based on the purest speculation.

■ Whatever result might be reached under common law standards, the best means of determining whether Bacon's fetus/infant was born alive is provided by Health and Safety Code section 7180, subdivision (a), which provides: "An individual who has sustained *either* (1) irreversible cessation of circulatory and respiratory functions, *or* (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead." (Italics added.) Inasmuch as life is the obverse of death, a statutory definition of death may be used to determine the presence of life. (*State* v. *Cornelius* (1989) 152 Wis.2d 272 [448 N.W.2d 434, 436].) Courts may resort to a common law definition of a state of being only when there is no statutory definition. (*People* v. *Mitchell* (1982) 132 Cal.App.3d 389, 396, fn. 2 [183 Cal.Rptr. 166].) Accordingly, Health and Safety Code section 7180, subdivision (a), properly is applied in criminal cases and provides the appropriate guidance in this instance. (Cf. *Mitchell, supra,* at p. 396, fn. 2.)

■ Since death is present when only one of the prongs of the statute is satisfied, neither must be satisfied for life to be present. The existence at birth of an independent heartbeat alone is sufficient to establish that there has been no irreversible cessation of the metabolic functions of circulation and respiration. (*State* v. *Cornelius, supra,* 448 N.W.2d at p. 436.) However, there must be more to support a conclusion that there is at least brain stem function, without which there is not life but death. In *Cornelius,* there was evidence the infant attempted to breathe on its own and did breathe for two days after it was placed on a respirator. In addition, there was medical evidence that the infant's efforts to breathe independently indicated there was brain stem activity. Accordingly, when these facts were coupled with the presence of an independent heartbeat, there was evidence the child was born alive. (*Ibid.*)

■ We need not decide in this case whether there must be expert medical testimony that breathing requires brain stem activity or whether a

layperson may infer that breathing does not occur without some form of brain activity, for here there is no evidence whatsoever of even the fetus/infant's attempted breathing. Neither is there any other evidence of brain activity. While the lack of evidence as to the presence or absence of some form of brain activity does not establish that the fetus/infant was born dead, it also does not establish that it was born alive. In short, as life exists under the terms of Health and Safety Code section 7180, subdivision (a), the People have failed to carry the burden of producing evidence Bacon's fetus/infant was born alive. (*Williams* v. *Superior Court* (1969) 71 Cal.2d 1144, 1147-1148 [80 Cal.Rptr. 747, 458 P.2d 987].) Accordingly, the superior court did not err in concluding the magistrate's implied finding that this was an infant born alive rather than a fetus, and thus a human being, is not supported by the evidence.

The order is affirmed.

Devich, J., and Vogel, J., concurred.