Lillie RANDLES, Individually, and as Personal Representative of the Estate of Seandre Aisha Lynette Randles, Deceased, and as Personal Representative of The Estate of Sean Caleb Tristen Randles, deceased, and all claimants Claiming through decedents' estates, Including Ezra Douglas, Appellants–Plaintiffs,

v.

INDIANA PATIENT'S COMPENSATION FUND and South Bend Memorial Hospital, Appellees–Defendants.

No. 49A02–0507–CV–683.

Court of Appeals of Indiana.

Feb. 6, 2007.

P. Gregory Cross, Muncie, IN, Richie D. Hailey, Ramey & Hailey, Indianapolis, IN, Attorneys for Appellants.

Robert F. Wagner, A. Richard M. Blaiklock, Stephanie L. Cassman, Lewis Wagner, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

SHARPNACK, Judge.

Lillie Randles ("Randles"), individually, as personal representative of the Estate of Seandre Randles ("Seandre"), and as personal representative of the Estate of Sean Randles ("Sean"), and Ezra Douglas (collectively, "Appellants") appeal the trial court's judgment in their claim against the Indiana Patient's Compensation Fund (the "Fund") and South Bend Memorial Hospital ("Hospital"). Appellants raise three issues, which we revise and restate as:

I. Whether the trial court's findings of fact and conclusions thereon regarding Randles's individual claim for the wrongful death of her daughter, Seandre, are clearly erroneous;

II. Whether the trial court's findings of fact and conclusions thereon regarding the claim of Seandre's Estate for the benefit of her dependent, Sean, are clearly erroneous;

III. Whether the trial court's findings of fact and conclusions thereon regarding Douglas's damages for the wrongful death of his son, Sean, are clearly erroneous; and

IV. Whether the trial court's findings of fact and conclusions thereon apportioning the damages are clearly erroneous.

We affirm.

The relevant facts follow. Seandre was a nineteen-year-old high school student and daughter of Randles and Andre Randles. On July 3, 2000, Seandre, who was pregnant with Douglas's child, was diagnosed with preeclampsia and was instructed to go to the emergency room of the Hospital. Preeclampsia is a condition "unique to child bearing where a woman develops elevated blood pressure and typically evidence of other systemic abnormalities including, protein in her urine or evidence of kidney dysfunction. Often times she can develop … problems with blood clotting to the point where her blood won't clot properly and it can lead to kidney and liver failure." Transcript at 203. After her admission to the Hospital, Seandre collapsed in a restroom and was found unconscious and without a pulse at 4:15 p.m. Efforts were made to resuscitate Seandre, and the baby, Sean, was delivered

by caesarean section at 4:57 p.m. Resuscitation efforts continued on Seandre until 5:29 p.m., when Seandre was declared dead. Sean lived until the following day when his life support was discontinued.

Randles was appointed personal representative of Seandre's Estate and Sean's Estate. Randles, individually and as the personal representative of Seandre's Estate, filed a proposed complaint against various healthcare providers with the Indiana Department of Insurance. She also filed a proposed complaint, individually and as the personal representative of Sean's Estate, against various healthcare providers with the Indiana Department of Insurance. A medical review panel found breaches of the requisite standard of care by a physician and the Hospital as to Seandre and by the Hospital as to Sean.

Randles, individually and as the personal representative of Seandre's Estate, then filed a complaint against the healthcare providers. Randles, individually and as the personal representative of Sean's Estate, also filed a complaint against the healthcare providers. The complaints were consolidated, and the Hospital filed a motion for partial summary judgment. The trial court found one "occurrence" within the meaning of the Indiana Malpractice Act and limited the plaintiffs' recovery from the Hospital to no more than $250,000.00. Appellant's Appendix at 213–214. The claims against the Hospital were settled for that amount, and the probate court granted the personal representative's petition to approve the payment of $250,000.00 from the Hospital to Sean's Estate.

Appellants then brought a complaint against the Fund alleging that they were entitled to "excess payments from the [Fund]." *Id.* at 15. After a bench trial, the trial court entered the following findings of fact and conclusions thereon:

## FINDINGS OF FACT

1. Seandre Randles ("Seandre") was born on December 8, 1980.

2. On July 3, 2000, Seandre was admitted to Memorial Hospital in South Bend as a result of complications with her pregnancy.

3. At 4:16 p.m., Seandre was found unconscious in a restroom in the hospital.

4. Resuscitation efforts by the hospital staff began at 4:16 p.m. and were continuous until 5:29 p.m.

5. A transient pulse was detected several times during the resuscitation.

6. A spontaneous pulse was palpable to the medical staff, when chest compressions were temporarily stopped during the resuscitation.

7. A pulse is caused by increased pressure in the artery as a result of a heartbeat, which is a sign of life.

8. Seandre entered the operating room at 4:55 p.m., where Dr. Jeanne Ballard performed an emergency cesarean.

9. A pulse was felt by the medical staff while in the operating room.

10. Seandre's body was warm, and her blood was not coagulating, when Dr. Ballard performed the cesarean section.

11. A live baby boy ("Sean"), was born at 4:57 p.m.

12. Seandre was alive at the time of the birth of Sean.

13. Resuscitation efforts by the medical staff continued for approximately 30 minutes after the birth of Sean.

14. Some time after the birth of her baby, Seandre died. The medical staff determined there was nothing else they could do and pronounced

Seandre dead at 5:29 p.m. on July 3, 2000.

15. Sean died on July 4, 2000.

16. Seandre was 19½ years old at the time of her death.

17. No persons, including family members, were financially dependent on Seandre at or prior to the time of her death on July 3, 2000.

18. Lillie and Andre Randles are the parents of Seandre, and were divorced in 1991, when Seandre was 11 years old.

19. Following the divorce, Seandre did not live with her father at any time.

20. Andre Randles remarried in 1993 and has a 12–year old daughter from the second marriage. Andre made weekly child support contributions in behalf of Seandre.

21. Lillie Randles never remarried.

22. At the time of her death on July 3, 2000, Seandre was living with her mother and two brothers, Alondre and Kendre Randles.

23. Seandre performed household chores typically performed by teenagers living at home, such as assisting with cooking and cleaning.

24. Seandre was planning to live at home with her mother after the baby was born, with Seandre and her mother acting as primary caretakers for the baby.

25. Ezra Douglas is the father of Sean.

26. Ezra Douglas is not making a claim for the loss of Sean's services.

27. Ezra Douglas is claiming the loss of the companionship and love of his child, Sean.

28. Seandre and Ezra Douglas were not married or engaged at the time of Seandre's death.

29. Ezra Douglas did not pay for Seandre's doctors' appointments nor the medical expenses associated with the birth of Sean.

30. Ezra Douglas was not at the hospital when Sean was born.

31. Three months after the deaths of Seandre and Sean, another woman became pregnant by Ezra Douglas and twins were born of that relationship on July 9, 2001; one boy and one girl.

32. Ezra Douglas is divorced from the mother of the twins and does not have custody of the two children, who are now four years old.

33. Ezra Douglas has not established legal paternity of the twins and is behind on his child support and not currently making child support payments.

34. After going through the panel process, the Estates of Sean and Seandre Randles filed separate malpractice lawsuits on June 28, 2003, in St. Joseph County.

35. Lillie Randles was named Plaintiff in her Individual Capacity, and in the Capacity of the Personal Representative of both estates. (Plaintiffs' Exhibits 1 and 2).

36. On June 11, 2004, the St. Joseph Superior Court entered partial summary judgment in the underlying case,[1] finding one "occurrence of malpractice" that resulted in the deaths of Sean and Seandre Randles. (Defendant's Exhibit B).

37. Plaintiffs' received $250,000.00 to settle claims by the Estate of Sean

1. By that time, the cases brought separately by the Estates of Sean and Seandre had been consolidated.

and to dismiss with prejudice the claims of the Estate of Seandre. (Plaintiffs' Exhibit 27).

38. Jointly, the Estates of Seandre and Sean incurred $5,098.75 in funeral and burial expenses. (Plaintiffs' Exhibit 10).

39. The Estates of Seandre and Sean have each been billed $3,195.00 for services provided by the Leatherman & Miller law firm. The Estates have not paid those amounts.

40. Individuals making claims in the Petition and this cause are: Lillie Randles, Individually and as the Representative of the Estates of Sean and Seandre; and Ezra Douglas.

### CONCLUSIONS OF LAW

41. Alondre, Kendre and Andre Randles were not dependent next-of-kin upon Seandre within the meaning of Ind.Code § 34–23–1–1 at the time of her death on July 3, 2000.

42. Ezra Douglas has a claim for damages for the death of Sean pursuant to Indiana's Wrongful Death of a Child Statute, Ind.Code § 34–23–2–1. The Court finds and concludes that Sean was a "child" within the meaning of subsection (a) of that statute. Under that statute, a claimant is entitled to loss of love, companionship, and services, of the decedent. Ezra Douglas is not making a claim for the loss of Sean's services under Ind.Code § 34–23–2–1(e). He is making a claim for the loss of Sean's "love and companionship" from the time of Sean's death until the date of Ezra's projected death, which is 49.9 years from the date of Sean's death. Ind.Code § 34–23–2–1(g). The Court concludes that the value of the loss of Ezra's love and companionship of Sean for that period is $300,000.00, which amount includes the $250,000.00 already received by the Estate of Sean from the healthcare providers in the underlying case (Plaintiffs' Exhibit 4). Therefore, the Court concludes that pursuant to Ind. Code § 34–34–18–15–3[sic], the Estate of Sean is entitled to recover $50,000.00 from the Indiana Patient's Compensation Fund as a result of Ezra Douglas' loss of love and companionship of his child, Sean, based on the standards in Ind.Code § 34–23–2–1.

43. Pursuant to Ind.Code § 34–23–2–1(e), the Estate of Sean may also make claims for healthcare and hospitalization expenses related to the alleged malpractice leading to the death of Sean; funeral and burial expenses; and attorney's fees and expenses associated with the administration of the Estate. There was no evidence presented regarding the healthcare and hospitalization expenses incurred by the Estate of Sean relating to the actions leading to Sean's death. The Estate of Sean and the Estate of Seandre incurred a joint funeral bill in the total amount of $5,098.75. Pursuant to Ind.Code § 34–23–2–1(e)(3)(B), the Court awards the Estate of Sean half of the total funeral bill, $2,549.38. (Plaintiffs' Exhibit 10) The Court also awards the Estate of Sean the cost associated with the administration of the child's estate, including reasonable attorney fees, in the amount of $3,195.00, pursuant to Ind.Code § 34–23–2–1(e)(3)(E).

44. The Court concludes that no one was dependent upon Seandre at the time of her death within the meaning of Ind.Code § 34–23–1–1. *Deaconess Hosp., Inc. v. Groeber [Gruber]*, 791 N.E.2d 841, 845 (Ind.Ct.App. 2003)("proof of dependency must show

a need of necessity of support on the part person alleged to be dependent ... coupled with the contribution to such support by the deceased"); *Necessary v. Inter–State Towing*, 697 N.E.2d 73, 75 (Ind.Ct.App.1998)("under Ind.Code § 34–23–1–1, only *dependent* next of kin can recover" for loss of love, etc.)(emphasis added). As a result, none of Seandre's next-of-kin has claims for damages for lost love, care and affection under the Wrongful Death Statute, Ind.Code § 34–23–1–1.

45. Under the standards in the Indiana Determination of Death Act, Ind.Code § 1–1–4–3, Seandre was not dead at the time she gave birth to Sean.

46. Seandre was not a "child" within the meaning of Indiana's Wrongful Death of a Child Statute Ind.Code § 34–23–2–1(a), because she died with a dependent—Sean. Because Seandre was not a "child" within the meaning of Ind.Code § 34–23–2–1, Lillie and Andre Randles have no claims for loss of Seandre's services, love, or companionship.

47. The Estate of Seandre is entitled to recover the following damages pursuant to Ind.Code § 34–23–1–1(e): Necessary and reasonable funeral and burial expenses; costs and expenses of administering the Estate, including reasonable attorney's fees; reasonable hospital services and medical expenses associated with the acts leading to the death of Seandre. The Plaintiffs put on no evidence of the amount of medical or hospital expenses associated with the acts leading to the death of Seandre. The Court concludes that Estate of Seandre is entitled to receive the following damages pursuant to Ind.Code § 34–23–1–1(e): funeral and burial expenses in the amount of $2,549.38; and fees associated with the administration of the Estate in the amount of $3,195.00.

### *JUDGMENT*

**IT IS THEREFORE ORDERED ADJUDGED AND DECREED** that judgment is entered in favor of the Plaintiff, Lillie Randles, as Personal Representative of the Estate of Seandre Aisha Lynette Randles, and against the Defendant, Indiana Patient's Compensation Fund, in the amount of $5,744.38.

**IT IS FURTHER ORDERED ADJUDGED AND DECREED** that judgment is entered in favor of the Plaintiffs, Lillie Randles, as Personal Representative of the Estate of Sean Caleb Tristen Randles and Ezra Douglas, and against the Defendant, Indiana Patient's Compensation Fund, in the amount of $55,744.38.

Appellant's Appendix at 7–13.

▮▮▮ The trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied*. In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evi-

dence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind.1999).

■■ Because the issues in this case concern the Wrongful Death Statute, Ind. Code § 34–23–1–1 ("WDS"), and the Child Wrongful Death Statute, Ind.Code § 34–23–2–1 ("CWDS"), we begin with a discussion of the various claims allowed under those statutes. Wrongful death actions are purely statutory. *Estate of Sears ex rel. Sears v. Griffin,* 771 N.E.2d 1136, 1138 (Ind.2002). "The [WDS and the CWDS] are disjunctive, so if the decedent fits the CWDS description (unmarried, under age twenty, no dependents), that statute provides the exclusive remedy for the wrongful death." *Id.*

■■ The WDS provides:

When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action had he or she, as the case may be, lived, against the latter for an injury for the same act or omission. When the death of one is caused by the wrongful act or omission of another, the action shall be commenced by the personal representative of the decedent within two (2) years, and the damages shall be in such an amount as may be determined by the court or jury, including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earnings of such deceased person resulting from said wrongful act or omission. That part of the damages which is recovered for reasonable medical, hospital, funeral and burial expense shall inure to the exclusive benefit of the decedent's estate for the payment thereof. The remainder of the damages, if any, shall, subject to the provisions of this article, inure to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased. If such decedent depart this life leaving no such widow or widower, or dependent children or dependent next of kin, surviving her or him, the damages inure to the exclusive benefit of the person or persons furnishing necessary and reasonable hospitalization or hospital services in connection with the last illness or injury of the decedent, performing necessary and reasonable medical or surgical services in connection with the last illness or injury of the decedent, to a funeral director or funeral home for the necessary and reasonable funeral and burial expenses, and to the personal representative, as such, for the necessary and reasonable costs and expenses of administering the estate and prosecuting or compromising the action, including a reasonable attorney's fee, and in case of a death under such circumstances, and when such decedent leaves no such widow, widower, or dependent children, or dependent next of kin, surviving him or her, the measure of damages to be recovered shall be the total of the necessary and reasonable value of such hospitalization or hospital service, medical and surgical services, such funeral expenses, and such costs and expenses of administration, including attorney fees.

Ind.Code § 34–23–1–1. Thus, under the WDS, if a decedent dies with a spouse, dependent children, or dependent next of kin, the decedent's personal representative may bring an action for damages including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earnings of the decedent. *Id.* Damages

for the medical, hospital, funeral, and burial expenses inure to the benefit of the estate, while the remainder of the damages inure to the benefit of the spouse and/or dependents. *Id.* If a decedent dies without a spouse or dependent, the damages are limited to the medical, funeral and burial, and administration costs. *Id.*

On the other hand, the CWDS provides:

(a) As used in this section, "child" means an unmarried individual without dependents who is:

(1) less than twenty (20) years of age; or

(2) less than twenty-three (23) years of age and is enrolled in an institution of higher education or in a vocational school or program.

(b) An action may be maintained under this section against the person whose wrongful act or omission caused the injury or death of a child. The action may be maintained by:

(1) the father and mother jointly, or either of them by naming the other parent as a codefendant to answer as to his or her interest;

(2) in case of divorce or dissolution of marriage, the person to whom custody of the child was awarded; and

(3) a guardian, for the injury or death of a protected person.

(c) In case of death of the person to whom custody of a child was awarded, a personal representative shall be appointed to maintain the action for the injury or death of the child.

(d) In an action brought by a guardian for an injury to a protected person, the damages inure to the benefit of the protected person.

(e) In an action to recover for the death of a child, the plaintiff may recover damages:

(1) for the loss of the child's services;

(2) for the loss of the child's love and companionship; and

(3) to pay the expenses of:

(A) health care and hospitalization necessitated by the wrongful act or omission that caused the child's death;

(B) the child's funeral and burial;

(C) the reasonable expense of psychiatric and psychological counseling incurred by a surviving parent or minor sibling of the child that is required because of the death of the child;

(D) uninsured debts of the child, including debts for which a parent is obligated on behalf of the child; and

(E) the administration of the child's estate, including reasonable attorney's fees.

(f) Damages may be awarded under this section only with respect to the period of time from the death of the child until:

(1) the date that the child would have reached:

(A) twenty (20) years of age; or

(B) twenty-three (23) years of age, if the child was enrolled in an institution of higher education or in a vocational school or program; or

(2) the date of the child's last surviving parent's death; whichever first occurs.

(g) Damages may be awarded under subsection (e)(2) only with respect to the period of time from the death of the child until the date of the child's last surviving parent's death.

(h) Damages awarded under subsection (e)(1), (e)(2), (e)(3)(C), and (e)(3)(D) inure to the benefit of:

(1) the father and mother jointly if both parents had custody of the child;

(2) the custodial parent, or custodial grandparent, and the noncustodial parent of the deceased child as apportioned by the court according to their respective losses; or

(3) a custodial grandparent of the child if the child was not survived by a parent entitled to benefit under this section.

However, a parent or grandparent who abandoned a deceased child while the child was alive is not entitled to any recovery under this chapter.

Ind.Code § 34–23–2–1.

██ Unlike in the WDS, the plaintiff in a CWDS case may recover damages for the loss of services, loss of love and companionship, medical expenses, counseling, uninsured debts of the child, and administration of the child's estate. A CWDS action is generally brought by the parent or guardian of the child. *Id.* However, here, as to Sean, the custodial parent, Seandre, died. *See* Ind.Code § 31–14–13–1 ("A biological mother of a child born out of wedlock has sole legal custody of the child, unless a statute or court order provides otherwise...."). Subsection (c) of the CWDS provides that "[i]n case of death of the person to whom custody of a child was awarded, a personal representative shall be appointed to maintain the action for the injury or death of the child." I.C. § 34–23–2–1(c). The statute does not specify whether it refers to the personal representative of the deceased child or the personal representative of the deceased custodial parent. *See, e.g., Johnson v. Parkview Health Systems, Inc.,* 801 N.E.2d 1281, 1285 (Ind.Ct.App.2004) ("The personal representative of the decedent's estate may not maintain the cause of action except upon the death of the person to whom

custody of the child was awarded. No other result may be obtained according to the language employed by our legislature."). *trans. denied.* In this case, it appears that because Sean's custodial parent had died, either Sean's Estate or Seandre's Estate could have brought the CWDS action. However, Seandre's Estate did not bring a CWDS claim as a result of Sean's death.

As is evident from the above discussion, we have a mixture of possible claims in this action, including claims by: (1) Seandre's parents under the CWDS for Seandre's death; (2) Douglas for Sean's death under the CWDS; (3) Seandre's Estate under the WDS; and (4) Sean's Estate under the CWDS. We will examine these possible claims in more detail below.

## I.

The first issue is whether the trial court's findings of fact and conclusions thereon regarding Randles's individual claim for the wrongful death of her daughter, Seandre, are clearly erroneous. Randles sought damages under the CWDS. The trial court rejected Randles's claim because it found that Seandre did not qualify as a "child," and, thus, the WDS, not the CWDS applied.

The determination of which statute applies here, the WDS or the CWDS, turns on whether Seandre died "without dependents." I.C. § 34–23–2–1 (" '[C]hild' means an unmarried individual without dependents who is ... less than twenty (20) years of age...."); *Sears,* 771 N.E.2d at 1138–1139. Whether Seandre died without a dependent depends upon the time of her death as compared to the time of Sean's birth. Randles argues that Seandre died at or before 4:15 p.m. on July 3, 2004, when she was found by Hospital personnel. The Fund argues that Seandre died at some point after Sean's birth.

The parties agree that the Uniform Determination of Death Act, Ind.Code § 1–1–4–3, is a factor in the determination of when Seandre died. Ind.Code § 1–1–4–3(a) provides: "Only an individual who has sustained either: (1) irreversible cessation of circulatory and respiratory functions; or (2) irreversible cessation of all functions of the entire brain, including the brain stem; is dead. A determination of death must be made in accordance with accepted medical standards." The parties do not dispute that Seandre had no voluntary respiratory functions during the time period at issue here. Further, no evidence was presented at the trial to indicate that Seandre had an irreversible cessation of all functions of the entire brain. Rather, the issue here is when Seandre sustained an irreversible cessation of her circulatory functions.

On this issue, the trial court found the following:

\* \* \* \* \*

3. At 4:16 p.m., Seandre was found unconscious in a restroom in the hospital.

4. Resuscitation efforts by the hospital staff began at 4:16 p.m. and were continuous until 5:29 p.m.

5. A transient pulse was detected several times during the resuscitation.

6. A spontaneous pulse was palpable to the medical staff, when chest compressions were temporarily stopped during the resuscitation.

7. A pulse is caused by increased pressure in the artery as a result of a heartbeat, which is a sign of life.

8. Seandre entered the operating room at 4:55 p.m., where Dr. Jeanne Ballard performed an emergency cesarean.

9. A pulse was felt by the medical staff while in the operating room.

10. Seandre's body was warm, and her blood was not coagulating, when Dr. Ballard performed the cesarean section.

11. A live baby boy ("Sean"), was born at 4:57 p.m.

12. Seandre was alive at the time of the birth of Sean.

13. Resuscitation efforts by the medical staff continued for approximately 30 minutes after the birth of Sean.

14. Some time after the birth of her baby, Seandre died. The medical staff determined there was nothing else they could do and pronounced Seandre dead at 5:29 p.m. on July 3, 2000.

\* \* \* \* \*

45. Under the standards in the Indiana Determination of Death Act, Ind.Code § 1–1–4–3, Seandre was not dead at the time she gave birth to Sean.

46. Seandre was not a "child" within the meaning of Indiana's Wrongful Death of a Child Statute Ind.Code § 34–23–2–1(a), because she died with a dependent—Sean. Because Seandre was not a "child" within the meaning of Ind.Code § 34–23–2–1, Lillie and Andre Randles have no claims for loss of Seandre's services, love, or companionship.

Appellant's Appendix at 7–12.

In support of their argument that these findings are clearly erroneous, Appellants cite the testimony of Dr. John Pless, a forensic pathologist, while the Fund cites the testimony of Dr. Jean Ballard, the obstetrician who delivered Sean by caesarean section. Before discussing the testimony of Dr. Pless and Dr. Ballard, we first note certain highlights from the medical

records admitted at the trial. The code[2] record indicates that Seandre was found at 4:15 p.m. "pulseless & not breathing." Exhibit 5 at 52.[3] Several doctors were present during the code, including Dr. Hamer, the anesthesiologist, Dr. Ballard, and Dr. Marker. *Id.* CPR was performed on Seandre, and her cardiac rhythm was noted as "EMD" or electro mechanical disassociation.[4] *Id.;* Transcript at 49. At 4:33, the code record indicates that a "carotid pulse [was] felt during CPR." Exhibit 5 at 52. At 4:35 and 4:36, an electrical shock was delivered to Seandre's heart, and at 4:36, the code record indicates a "coarse V–Fib" cardiac rhythm and a "carotid pulse felt B/P—60 palpable." *Id.* at 51. At 4:38, the code record indicates, "compressions started—no pulse felt." *Id.* At 4:41, an electrical shock was again delivered, and the code record indicates that a pulse was "felt femorally transiently." *Id.* at 50. At 4:43, Seandre had no pulse, and compressions were restarted. *Id.* At 4:55, Seandre was transported to the operating room for a caesarean section, and Sean was delivered at 4:57 p.m. *Id.* at 49, 53. After Sean was delivered, CPR was continued until 5:29 p.m. *Id.* at 47.

Dr. Hamer's notes indicate the following: "Mostly EMD, or V fibrillation, or pulse which lasted only transiently. Decision to do emergency cesarean, Pt placed on gurney, CPR in process and taken to OR.... Total CPR continued for greater than one hour, rarely able to get out of EMD, and then only transiently. Only EMD the last 30–45 [minutes]. Resuscitation stopped at [5:28]." *Id.* at 22. Dr. Marker's code notes provide that a carotid pulse and blood pressure of 60 was felt at 4:37 p.m., that "continual CPR" was performed with "intermittent pulse felt," and that a femoral pulse was felt briefly near 4:41 p.m. *Id.* at 13. Dr. Marker's notes then describe Seandre's transfer to the operating room, and he notes that CPR was continued "enroute." *Id.* His notes then state: "During pauses in CPR, monitor show asystole,[5] wide complex bradycardia, V-tack, coarse v fib. Rare sinus followed by rapid [illegible] of complex rare pulse felt. Minimal BP." *Id.* Dr. Marker then indicated that compressions were stopped at 5:29 p.m. *Id.* Dr. Ballard's notes indicate that "[a]s the resuscitation progressed and we were unable to maintain natural pulse ... we proceeded at that point to [emergency] C/S which was done in main OR. Following delivery the patient expires with unresponding electro dissociation." *Id.* at 12.

■■■■ Dr. Pless was not present during the resuscitation attempts for Seandre and did not perform her autopsy. Based upon his review of Seandre's medical records, Dr. Pless testified that "there was no evidence of vital function and by that I

---

**2.** The term "code" appears to be the shortened version of the term "code blue," which is defined as:

a declaration of or a state of medical emergency and call for medical personnel and equipment to attempt to resuscitate a patient especially when in cardiac arrest or respiratory distress or failure <summoned by emergency *Code Blues,* doctors had brought her back to life more than once—Bill Bryan>; *also:* the attempt to resuscitate the patient.

Merriam–Webster Medline Plus Medical Dictionary, available at http://www.nlm.nih.gov/ medlineplus/mplusdictionary.html (last visited January 17, 2007).

**3.** Some, but not all, of the records in Exhibit 5 are labeled with page numbers in the bottom right corner. Those page numbers are referred to here.

**4.** Dr. Pless indicated that, in laymen's terms, EMD means that the heart is not beating but there is still electrical activity in the heart.

**5.** Dr. Pless testified that asystole means "without heartbeat." Transcript at 45.

mean respiration or sustained heartbeat from the time that she was discovered in the restroom at the hospital throughout the resuscitative effort." Transcript at 39. Dr. Pless stated:

> There was electrical activity [EMD], which can go on in a heart for many minutes, if not an hour or more, but the actual beating of the heart was not seen except in those instances where some kind of electrical stimulus was applied to the body in the form of cardiac resuscitation, electric shock to promote the heart to beat. And following those electric shocks there was palpable pulse, but it was certainly limited and was not sustained.

*Id.* at 39–40. Although a "carotid pulse" was felt and "BP 60[was] palpable" after electric shock was administered to Seandre, Dr. Pless testified that the pulse was a "response to the shock" and was not sustained. *Id.* at 51. Further, he testified that the "transitory" pulse felt a couple of minutes later was "a response to the electrical shock" and did not indicate that Seandre was alive. *Id.* at 55. Dr. Pless expressed the opinion that "[Seandre's] death goes back to the time when she was found without any vital functions since they were unable to establish or sustain any kind of vital function during the resuscitation." *Id.* at 40. Dr. Pless defined

"irreversible" as "fail[ing] to see any signs of improvement." [6] *Id.* at 72.

Dr. Ballard admitted that she was not an expert on time and manner of death. Rather, Dr. Ballard testified regarding her observations of Seandre's condition during the code. Dr. Ballard testified that she arrived shortly after the code began. According to Dr. Ballard, there "were several instances during the resuscitation where [they] were able to elicit a pulse" from Seandre. *Id.* at 174. During these instances, chest compressions were stopped for an instant, and a pulse was felt. Dr. Ballard testified that Dr. Marker's notes imply Seandre had pulses in the operating room. Dr. Ballard performed the caesarean section on Seandre, and "[b]ased on the warmth of her body and the fact that her blood had not clotted, and that there was mention that they were getting spontaneous pulse in the OR," Dr. Ballard believed that Seandre was alive at that time. *Id.* at 179. Dr. Ballard described Seandre's condition after the caesarean section as:

> Up until the point of delivery we had indication of life because [Seandre] was able to have spontaneous pulses. Once the patient entered into a state of unresponding electromechanical dissociation, we felt that that was incompatible with

---

**6.** Appellants also mention that "Dr. Pless' opinions in this regard were supported by three eminently qualified colleagues, all of whom reached identical conclusions." Appellants' Brief at 15. These three expert opinions were presented to the trial court in the form of affidavits in opposition to the Fund's motion for summary judgment. These affidavits were not admitted at the trial of this matter, and in fact, the trial court sustained an objection to their admission at the trial. In their reply brief, Appellants state:

> The affidavits of the three other renowned physicians were referred to in the plaintiff's principal brief simply to demonstrate that all of the expert evidence before the court

was consistent. Although technically not part of the trial proceedings, those affidavits were before the judge and part of the record, as designated evidence in response to the Fund's summary judgment motion. Appellants' Reply Brief at 2 n. 1. "It is well settled that matters outside the record cannot be considered by the court on appeal." *In re D.Q.*, 745 N.E.2d 904, 912 (Ind.Ct.App.2001). Despite the fact that the affidavits were considered by the trial court during the summary judgment proceedings, the affidavits were not admitted during the trial. Because they were not considered by the trial court in making its findings of fact and conclusions thereon, we cannot consider them on appeal.

signs of life and was evidence that [Seandre] had expired.

*Id.* at 176. Dr. Ballard testified that, with a reasonable medical probability, Seandre was alive at the time she delivered Sean.

■ First, Appellants seem to argue that the evidence is insufficient to support the trial court's findings because the Fund offered no expert testimony to counter Dr. Pless's expert opinion. 22A AM.JUR.2D *Death* § 424 provides:

> The most satisfactory proof of death is by the direct testimony of a witness to the fact. Lay testimony about the death of a person may meet a party's burden of proving survivorship by showing evidence of a positive sign of life in one body and the absence of any such sign in the other.
>
> Because death is both a legal and a medical question, traditionally, the law has regarded the question of at what moment a person died as a question of fact to be determined by expert medical testimony.
>
> Although the legal standard as to what constitutes death is determined by the courts or legislation, it is the role of the medical professional to decide whether brain death or other cessation of cardiopulmonary function is present in accordance with current medical standards; judicial intervention should be limited to a review of the procedures followed and a determination that the findings are consistent with the established medical criteria. . . .

(footnotes omitted). Dr. Ballard is a board certified obstetrician gynecologist who has delivered several thousand babies. Dr. Ballard is an expert qualified to give an opinion as to whether her patient was dead or alive. *See* Evid. Rule 702(a) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."). Although Dr. Ballard had different qualifications than Dr. Pless, it was for the trial court to weigh Dr. Ballard's testimony against Dr. Pless's testimony.

In support of their argument that the trial court's finding that Seandre died after Sean was born is clearly erroneous, Appellants cite *State v. Green*, 245 Kan. 398, 781 P.2d 678, 683 (1989). In *Green*, the pertinent issue was whether a baby was born alive or was stillborn. 781 P.2d at 683. The mother had been shot and efforts to resuscitate her failed. *Id.* at 681. After a caesarean section was performed, the physicians attempted to resuscitate the baby. *Id.* After ten minutes of resuscitation efforts, a faint heartbeat was felt but was lost while transferring the baby to the intensive care unit, and no other signs of life were detected. *Id.* at 681–682. The physician described the birth as a "stillbirth" and "brain dead" from the time of the caesarean section, even though he briefly considered the baby alive when the heartbeat was discovered. *Id.* at 682, 683. On appeal of the defendant's murder conviction, the Kansas Supreme Court held that "[a]lthough a faint heartbeat was detected and resuscitation efforts continued for forty minutes before the fetus was pronounced dead, the evidence introduced indicates the fetus was stillborn." *Id.* at 683. The court cited, in part, a Kansas statute defining death as "(1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem." *Id. See also People v. Flores*, 3 Cal.App.4th 200, 203, 4 Cal. Rptr.2d 120 (1992) (noting that, although the State failed to prove that a baby had brain function at its birth and, thus, failed

to prove that the baby was alive, "[t]he existence at birth of an independent heartbeat alone is sufficient to establish that there has been no irreversible cessation of the metabolic functions or circulation and respiration").[7]

The Fund relies upon *State v. Cornelius,* 152 Wis.2d 272, 448 N.W.2d 434 (1989), *review denied.* There, the issue was again whether a baby was born alive. 448 N.W.2d at 436. After a car accident, the baby was delivered by emergency caesarean section. *Id.* at 435.

> The infant ... was very limp, very pale, and in extremely poor condition at birth. This was due to the fact that the placenta had detached from the womb, depriving the fetus of oxygen for some unknown period of time. The infant did have a heartbeat and was attempting to breathe. He was placed on artificial respiration, and his condition improved somewhat.
>
> A brain wave test (electroencephalograph or EEG) performed on the following day revealed no evidence of brain wave activity. The infant showed no response to stimuli and exhibited no movement of his own. Two days after the accident, his heart and lungs failed and he was pronounced dead.

*Id.* After the trial court dismissed charges against the defendant driver because the baby was "brain-dead upon delivery," the State appealed. *Id.* at 435–436. On appeal, the Wisconsin Court of Appeals relied upon the Wisconsin Determination of Death Act, which provided: "An individual who has sustained either irreversible cessation of circulatory and respiratory func-

tions or irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death shall be made in accordance with accepted medical standards." *Id.* at 436. The court determined that the baby had not sustained irreversible cessation of circulatory and respiratory functions at the time of its birth because the baby had an independent heartbeat, breathed fitfully when placed on a respirator, and its heart and lungs continued to function for almost two days. *Id.* Thus, the first prong of the Determination of Death Act did not apply. *Id.* Moreover, there was medical testimony that the infant's behavior was indicative of brain stem activity. *Id.* Thus, the second prong of the Act did not apply. *Id.* The court concluded that it was error to find the baby "brain dead." *Id.*

■ Here, the question is whether the trial court's finding that Seandre died after Sean was born is clearly erroneous. The trial court's finding was based upon the fact that Seandre had transient heartbeats during resuscitation efforts and. Dr. Ballard's testimony that Seandre was alive at the time she delivered Sean by caesarean section. *See* Appellant's Appendix at 7–12. The Uniform Determination of Death Act requires "irreversible cessation of circulatory and respiratory functions" for death to occur. I.C. § 1–1–4–3. It is uncontradicted that Seandre had no respiratory functions. Thus, the issue is whether she had an irreversible cessation of circulatory functions prior to Sean's birth. To conclude that the trial court's findings are clearly erroneous, we would have to find that the record "contains no facts to support them either directly or by inference."

---

7. Appellants also mention *Lane v. Commonwealth,* 219 Va. 509, 248 S.E.2d 781, 784 (1978), which was a murder case against a mother. The issue there was whether the baby was born alive. 248 S.E.2d at 783. The experts testified that the baby died from lack of oxygen, but the experts were unable to state the cause of the lack of oxygen. Thus, the evidence was insufficient to sustain the mother's conviction. However, the Uniform Determination of Death Act was not at issue in *Lane.*

*Quillen*, 671 N.E.2d at 102 (emphasis added). The above review of the evidence and testimony reveals that, while Dr. Pless and Dr. Ballard had differences of opinion, there is some evidence to support the trial court's finding that Seandre was alive at the time Sean was born. We cannot reweigh the evidence on appeal or judge the credibility of the witnesses. Consequently, we conclude that the trial court's finding that Seandre was alive at the time Sean was born is not clearly erroneous. As a result, Seandre had a dependent when she died and did not qualify as a child under the CWDS. The trial court's finding that Randles's individual claim under the CWDS failed is not clearly erroneous.

## II.

Appellants' next issue is whether the trial court's findings of fact and conclusions thereon regarding the claim of Seandre's Estate for the benefit of her dependent, Sean, are clearly erroneous. Because Seandre died after Sean was born, she died with a dependent, Sean, and Seandre's Estate had a claim under the Wrongful Death Statute (WDS) for the benefit of her dependent. I.C. § 34–23–1–1 (providing that an action for wrongful death shall be commenced by the personal representative of the decedent and that "[t]he remainder of the damages ... shall ... inure to the exclusive benefit of the ... dependent children ...."). Sean's death would not preclude the recovery of damages for his benefit by Seandre's personal representative. *See Bemenderfer v. Williams*, 745 N.E.2d 212, 214 (Ind.2001) (holding that "the wrongful death statute does not operate to preclude the statutory beneficiary who dies before judgment from recovering wrongful death damages").

The trial court awarded no damages to Seandre's Estate for the benefit of Sean.

Appellants argue that the trial court made erroneous findings regarding whether Seandre had a dependent. Two of the trial court's findings are relevant here. First, the trial court found:

> The Court concludes that no one was dependent upon Seandre at the time of her death within the meaning of Ind. Code § 34–23–1–1. *Deaconess Hosp., Inc. v. Groeber [Gruber]*, 791 N.E.2d 841, 845 (Ind.Ct.App.2003)("proof of dependency must show a need of necessity of support on the part [of the] person alleged to be dependent ... coupled with the contribution to such support by the deceased"); *Necessary v. Inter-State Towing*, 697 N.E.2d 73, 75 (Ind.Ct.App.1998)("under Ind.Code § 34–23–1–1, only *dependent* next of kin can recover" for loss of love, etc.)(emphasis added). As a result, none of Seandre's next-of-kin has claims for damages for lost love, care and affection under the Wrongful Death Statute, Ind. Code § 34–23–1–1.

Appellant's Appendix at 12 (Finding No. 44). Next, the trial court found: "Seandre was not a 'child' within the meaning of Indiana's Wrongful Death of a Child Statute Ind.Code § 34–23–2–1(a), because she died with a dependent—Sean." *Id.* (Finding No. 46). Clearly, one of the trial court's findings is erroneous. Seandre either died with a dependent, Sean, or she died without a dependent because she died before Sean was born. We concluded above, see Part I, that the trial court's finding that Seandre died after Sean was born was not clearly erroneous. Consequently, Seandre died with a dependent, and the trial court's finding that Seandre died without a dependent in Finding No. 44 is clearly erroneous.

 Regardless, the Fund argues that Appellants waived a claim that Seandre's Estate was entitled to damages under the

WDS for the benefit of Sean because Appellants failed to present the claim to the trial court. In their reply brief, Appellants concede that this case was tried only under the premise that Seandre died without a dependent and that Seandre's parents were entitled to damages under the CWDS. At oral argument, Appellants contended that a claim that Seandre's Estate was entitled to damages under the WDS for the benefit of Sean had been presented in their petition for payment of damages from the Fund. In the petition, Appellants requested damages in the amount of one million dollars for each of Seandre's Estate, Sean's Estate, Ezra Douglas, and Lillie Randles. However, after filing the petition, Appellants at no point argued that Seandre's Estate was entitled to wrongful death damages for benefit of Sean. See Appellant's Appendix at 38–50 (summary judgment response which requested damages for Seandre's siblings, her parents, Lillie and Andre Randles, and Ezra Douglas), Appellant's Appendix at 100–104 (proposed findings which requested damages for Lillie and Andre Randles only), and Transcript at 280–300 (closing arguments which discuss claims for Lillie and Andre Randles and Ezra Douglas).

Appellants "put all of their eggs in one basket" and argued only that Seandre died without dependents and that Seandre's parents were entitled to damages under the CWDS. Appellants now argue that, despite their failure to argue this alternative theory of recovery, the trial court should have entered judgment for Seandre's Estate on this claim. Specifically, Appellants argue that "it should have been incumbent upon that tribunal to enter a judgment fully resolving all of the issues that determination entails...." Appellants' Reply Brief at 12.

▬ Ind. Trial Rule 8(E)(2) allows a party to plead alternative and even inconsistent theories of recovery: "A pleading may ... state as many separate claims or defenses as the pleader has regardless of consistency and whether based on legal or equitable grounds." *See Cahoon v. Cummings*, 734 N.E.2d 535, 542 (Ind.2000) (holding that the plaintiff could pursue alternative theories of both a wrongful death and a survival action); *see also Smith v. Johnston*, 854 N.E.2d 388 (Ind.Ct.App. 2006) (relying upon *Cahoon* for the proposition that alternative inconsistent theories could be presented). Ind. Trial Rule 8(E) "is designed to avoid the problem that a plaintiff may recover nothing on a valid claim if forced to speculate as to which theory a jury will ultimately find credible." *Id.* at 543. This is exactly the situation that occurred here.

A similar issue was encountered in *Johnson v. Parkview Health Systems, Inc.*, 801 N.E.2d 1281 (Ind.Ct.App.2004), *trans. denied.* There, this court held:

> One final argument presented by Johnson is that even if she could not proceed under the CWDS that she be allowed to proceed under the Medical Malpractice Act. This contention has merit as our Supreme Court has held that an action for death resulting from a health care provider is not exclusively within the ambit of the WDS, but may properly be brought under the Medical Malpractice Act. *Miller v. Terre Haute Regional Hosp.*, 603 N.E.2d 861, 864 (Ind.1992). Indeed, in *Goleski v. Fritz*, 768 N.E.2d 889 (Ind.2002), our Supreme Court determined that a representative of a decedent could pursue a claim under the Medical Malpractice Act even though she could not maintain an action under the WDS.
>
> However, the theory that recovery was available under the Medical Malpractice Act regardless of the existence of a claim under the CWDS or the WDS

was not before the trial court. We have found nothing in the appendix or transcript which indicates that this argument was presented to the trial court during the summary judgment proceedings. Rather, the sole theory of recovery was that Johnson could seek damages through the CWDS.

A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court. *GKC Indiana Theatres, Inc., v. Elk Retail Investors, LLC,* 764 N.E.2d 647, 652 (Ind.Ct.App. 2002). However, that principle is not without limits. As explained by this court in *Bielat v. Folta:*

> The rule that parties will be held to trial court theories by the appellate tribunal does not mean that no new position may be taken, or that new arguments may not be adduced; all that it means is that substantive questions independent in character and not within the issues or not presented to the trial court shall not be first made upon appeal. Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward.

141 Ind.App. 452, 454, 229 N.E.2d 474, 475 (1967).

Here, the trial court never had the opportunity to determine whether a cause of action existed under the Medical Malpractice Act separate from the WDS or the CWDS because Johnson never made that claim in opposing the motion for summary judgment. Instead, she placed her entire ability to recover upon whether she had properly pursued a claim under the CWDS. Consequently, we may not review this new theory of recovery for the first time in this appeal.

*Id.* at 1287–1288.

Here, Appellants initially requested a million dollars in damages for Seandre's Estate but did not specify the basis for that claim in the petition and never mentioned the claim again during the proceedings. Randles relied solely upon her CWDS claim, and an alternative claim for damages to Seandre's Estate for Sean's benefit was never presented or mentioned to the trial court. Consequently, this issue is not before us. *See, e.g., id.*

### III.

■ The next issue is whether the trial court's findings of fact and conclusions thereon regarding Douglas's damages for the wrongful death of his son, Sean, are clearly erroneous. Douglas argues that the damages awarded by the trial court are grossly inadequate. When the specific issue on review relates to questions of inadequate or excessive damages, we should not reverse a damage award if the award is within the scope of the evidence before the trial court, and we may not reweigh the evidence or judge the credibility of the witnesses. *Dunn v. Cadiente,* 516 N.E.2d 52, 54 (Ind.1987), *reh'g denied.*

Douglas's claim was brought under the CWDS, Ind.Code § 34–23–2–1, which provides in part that a plaintiff may recover for the loss of a child's love and companionship. The trial court made the following findings relevant to Douglas's damages:

25. Ezra Douglas is the father of Sean.

26. Ezra Douglas is not making a claim for the loss of Sean's services.

27. Ezra Douglas is claiming the loss of the companionship and love of his child, Sean.

28. Seandre and Ezra Douglas were not married or engaged at the time of Seandre's death.

29. Ezra Douglas did not pay for Seandre's doctors' appointments nor the medical expenses associated with the birth of Sean.

30. Ezra Douglas was not at the hospital when Sean was born.

31. Three months after the deaths of Seandre and Sean, another woman became pregnant by Ezra Douglas and twins were born of that relationship on July 9, 2001; one boy and one girl.

32. Ezra Douglas is divorced from the mother of the twins and does not have custody of the two children, who are now four years old.

33. Ezra Douglas has not established legal paternity of the twins and is behind on his child support and not currently making child support payments.

\* \* \* \* \*

42. Ezra Douglas has a claim for damages for the death of Sean pursuant to Indiana's Wrongful Death of a Child Statute, Ind.Code § 34–23–2–1. The Court finds and concludes that Sean was a "child" within the meaning of subsection (a) of that statute. Under that statute, a claimant is entitled to loss of love, companionship, and services, of the decedent. Ezra Douglas is not making a claim for the loss of Sean's services under Ind.Code § 34–23–2–1(e). He is making a claim for the loss of Sean's "love and companionship" from the time of Sean's death until the date of Ezra's projected death, which is 49.9 years from the date of Sean's death. Ind.Code § 34–23–2–1(g). The Court concludes that the value of the loss of Ezra's love and companionship of Sean for that period is $300,000.00, which amount includes the $250,000.00 already received by the Estate of Sean from the healthcare providers in the underlying case (Plaintiffs' Exhibit 4). Therefore, the Court concludes that pursuant to Ind. Code § 34–34–18–15–3[sic], the Estate of Sean is entitled to recover $50,000.00 from the Indiana Patient's Compensation Fund as a result of Ezra Douglas' loss of love and companionship of his child, Sean, based on the standards in Ind.Code § 34–23–2–1.

\* \* \* \* \*

**IT IS FURTHER ORDERED ADJUDGED AND DECREED** that judgment is entered in favor of the Plaintiffs, Lillie Randles, as Personal Representative of the Estate of [Sean] and Ezra Douglas, and against the [Fund] in the amount of $55,744.38.

Appellant's Appendix at 9–13.

 Douglas argues that the trial court's damage award was inadequate because the trial court inappropriately considered his subsequent marriage and his relationship with his subsequent children.[8]

8. Douglas also argues that the trial court did not place enough weight on "emotional aspects this tragedy visited upon" him. Appellant's Brief at 26. The CWDS allows the recovery of damages for a parent's loss of love, companionship, and services due to the death of a child. Douglas's emotional state is relevant only to the extent that it is relevant to his loss of love, companionship, and services.

This court has held that "companionship" refers to "a type of love, care and affection," but does not refer to "solatium, or recompense for grief or wounded feelings." *Challenger Wrecker Mfg. Inc. v. Estate of Boundy,* 560 N.E.2d 94, 99 (Ind.Ct.App.1990), *trans. dismissed.* Douglas's request to place more emphasis on his emotional state is simply a request that we reweigh the evidence and

Indiana has long held that evidence of remarriage is not admissible to mitigate damages in a wrongful death action. *Gilmer v. Carney,* 608 N.E.2d 709, 712 (Ind. Ct.App.1993), *reh'g denied; Consolidated Stone Co. v. Morgan,* 160 Ind. 241, 66 N.E. 696, 699 (Ind.1903) ("The amount of such damages ought not to be increased or diminished on account of a change in the situation of the widow, children, or next of kin after the death of the injured person; nor do they in any wise depend upon the character or conduct of one or more of the persons who might, or might not, be entitled to share in their distribution."). Although Douglas and Seandre were not married, this principle would appear to be equally applicable here, and the evidence of his subsequent marriage is irrelevant to his damages for the death of Sean.[9]

Similarly, Douglas argues that his relationship with his twins is not relevant to his damages for loss of love and companionship with Sean. Although the Fund argues that "how [Douglas] interacted with his surviving children is clearly probative of how he might have interacted with Sean, if Sean had lived," Appellee's Brief at 29, neither party cites any authority on this issue. Our research reveals no Indiana cases discussing this issue. *Cf. Hardiman v. Akins,* 738 N.E.2d 693, 695 (Ind.Ct.App.2000) (holding that a father's complete failure to meet, speak with, or correspond with his son indicated that the trial court erred by awarding the father damages for loss of services, love, and companionship). We conclude that, like the evidence of Douglas's subsequent marriage, evidence of Douglas's relationship with his subsequent children is irrelevant to his parental bond with Sean and his damages for loss of love and companionship for Sean's death. Finding Nos. 31, 32, and 33 are improper considerations in determining Douglas's damages sustained for the death of Sean.

■ The evidence presented at the trial indicated that Seandre planned to live with her mother after Sean was born and that Seandre and Randles would be the primary caregivers for the baby. Seandre and Douglas were not planning on living together after Sean's birth and had no immediate plans to get married. Douglas purchased some "big" items for the baby, like a crib for Randles's home. Transcript at 115, 134. However, Douglas did not pay for any of Seandre's doctors' appointments or medical expenses. On the day Seandre died, Douglas did not go to the doctor or the hospital with Seandre. At trial, Douglas could not remember whether Seandre and Sean died in June or July of 2000.

■ The issue is whether the $300,000 damage award is within the scope of the

---

judge Douglas's credibility, which we cannot do.

9. During Douglas's direct examination, his counsel asked Douglas about his marriage following Seandre's death and about his twins. The Fund argues that Appellants waived any objection to the admission of this evidence. Appellee's Brief at 28–29 (citing Transcript at 145 where Appellants' counsel stated, "I'm not objecting to questions about his relationship with his current children"). Appellants point out that "[w]hen a case is tried to the bench, we presume that the court ignored inadmissible evidence in reaching its judgment." *Estate of Fowler v. Perry,* 681 N.E.2d 739, 741 n. 2 (Ind.Ct.App.1997), *trans. denied.* We also note that "[a] party cannot invite error and then request relief on appeal based upon that ground; such an error cannot be reviewed by this court." *Olcott Intern. & Co., Inc. v. Micro Data Base Systems, Inc.,* 793 N.E.2d 1063, 1077 (Ind.Ct.App.2003), *trans. denied.* We need not decide whether Douglas waived this argument because we conclude below that even if the trial court erred, the damage award is not clearly erroneous.

evidence before the trial court. *Dunn*, 516 N.E.2d at 54. We note that "[s]pecial findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision." *Wagner v. Spurlock*, 803 N.E.2d 1174, 1179 (Ind.Ct.App.2004). Despite the trial court's findings regarding Douglas's subsequent marriage and relationship with his subsequent children and given the other evidence presented at the trial, we cannot say that the $300,000 damage award is outside the scope of the evidence.

### IV.

■ The final issue is whether the trial court's findings of fact and conclusions thereon apportioning the damages are clearly erroneous. On this issue, the trial court found:

> 37. Plaintiffs' received $250,000.00 to settle claims by the Estate of Sean and to dismiss with prejudice the claims of the Estate of Seandre. (Plaintiffs' Exhibit 27).

> \* \* \* \* \*

> 42. [ ] The Court concludes that the value of the loss of Ezra's love and companionship of Sean for that period is $300,000.00, which amount includes the $250,000.00 already received by the Estate of Sean from the healthcare providers in the underlying case (Plaintiffs' Exhibit 4). Therefore, the Court concludes that pursuant to Ind. Code § 34-34-18-15-3[sic], the Estate of Sean is entitled to recover $50,000.00 from the Indiana Patient's Compensation Fund as a result of Ezra Douglas' loss of love and companionship of his child, Sean, based on the standards in Ind.Code § 34-23-2-1.

\* \* \* \* \*

**IT IS FURTHER ORDERED ADJUDGED AND DECREED** that judgment is entered in favor of the Plaintiffs, Lillie Randles, as Personal Representative of the Estate of [Sean] and Ezra Douglas, and against the [Fund] in the amount of $55,744.38.

Appellant's Appendix at 10–13. Douglas argues that the trial court erred by reducing his $300,000.00 judgment by the $250,000.00 settlement. Specifically, Douglas argues that the $250,000.00 must be apportioned between the claims for the wrongful death of Seandre and the wrongful death of Sean.

Despite the parties' sparse discussion of this issue, resolution of the issue requires a discussion of the various types of claims presented in this case. First, Randles, individually and as the personal representative of Seandre's Estate and Sean's Estate, filed complaints against the healthcare providers for damages. Although the complaints did not specify the basis for any of the claims, the only possible basis for Randles's individual claim would have been for Seandre's death under the CWDS. I.C. § 34-23-2-1 (noting that an action for child wrongful death may be maintained by, "in case of divorce or dissolution of marriage, the person to whom custody of the child was awarded"). Seandre's Estate would have had a claim under the WDS for her funeral, burial, medical, and estate administration costs and for damages for Sean's loss of his parent. *See* I.C. § 34-23-1-1; *Johnson Controls, Inc. v. Forrester*, 704 N.E.2d 1082, 1084 (Ind. Ct.App.1999) ("Although pecuniary loss is the foundation of a wrongful death action, Indiana has long recognized recovery of emotional damages for ... dependent children. A decedent's minor children may recover for loss of parental training and guidance as well as for the loss of their

parent's care.") (internal citation omitted), *trans. denied.* As for Sean's Estate, the only possible claim would have been for Sean's death under the CWDS because Sean's custodial parent had died. *See* I.C. § 34–23–2–1(c) ("In case of death of the person to whom custody of a child was awarded, a personal representative shall be appointed to maintain the action for the injury or death of the child."). Although Douglas would also have a claim under the CWDS for the death of his son, Douglas was not a party to this complaint.

Randles, individually and as personal representative of Seandre's Estate and Sean's Estate, settled the actions against the Hospital for $250,000.00.[10] As part of the settlement, Randles agreed to dismiss the claims against the Hospital. The settlement does not indicate how the $250,000.00 should be distributed between Randles, Seandre's Estate, and Sean's Estate, but Randles, as the personal representative of Sean's Estate, petitioned the probate court to approve the settlement and payment of the full $250,000 to Sean's Estate. Thus, the $250,000 payment must have been allocated to Sean's Estate to pay damages for Sean's death under the CWDS.

In the current action, the trial court awarded $300,000.00 to Douglas for Sean's death under the CWDS but reduced these damages by $250,000.00 for the prior settlement payment to Sean's Estate. Douglas presents no authority for the proposition that this court could now reallocate the $250,000 between Seandre's Estate and Sean's Estate. Given that the $300,000 damages award was for Sean's death under the CWDS and the $250,000 payment was also allocated to pay damages for Sean's death under the CWDS,

we cannot say that the trial court abused its discretion by reducing the $300,000 damages award by $250,000.

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KIRSCH, C.J. and SULLIVAN, J. concur.

---

**10.** The record does not indicate how Seandre's Estate's action against the physician was